LEWIS G. POLLOCK & others[1] vs. JOHN A. MARSHALL,
administrator,[2]
(and a companion case[3]).

Middlesex. December 6, 1983. — March 28, 1984.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Practice, Civil,* Master: findings. *Fiduciary. Attorney at Law,* Fiduciary
duty, Transaction with client.

Certain transactions among a corporation, the attorney who had served as the
corporation's general counsel, and the corporation's founder and presi-
dent, who was deceased at the time of litigation challenging these trans-
actions, which involved (a) a restructuring of the equity ownership of
the corporation and the acquisition of substantial stock holdings by an
investment partnership consisting of the attorney and the other members
of his law firm; (b) the decedent's reacquisition of shares from the
investment partnership; (c) director action assenting to the attorney's
pledge of shares held by him and fixing the terms on which the corporation
might reacquire the shares; and (d) the decedent's decision to invest his
own funds in an unrelated corporation in which the attorney had an
interest, were not to be set aside by reason of the facts that neither the
decedent nor the corporation had independent legal advice and that the
attorney never advised either to obtain independent legal advice, in view
of a master's warranted findings that the attorney's conduct did not
involve overreaching or undue influence, and hence did not amount to
a breach of his fiduciary duty [553-558], and in view of the master's
additional warranted findings from which this court inferred that the
challenged transactions were not unfair [558-559].

An attorney's breach of his fiduciary duty in connection with an employment
contract between himself and a corporation of which he served as general
counsel did not preclude him from retaining the appreciated value of
shares of the corporation's stock which he had obtained in earlier trans-
actions untainted by the breach. [559]

---

[1] Dennis M. O'Connor, Alan L. Jacobs, Alan L. Stanzler, and Edward
N. Gadsby, Jr., doing business as Pollock, O'Connor and Jacobs.

[2] Administrator of the estate of Albert J. Marshall.

[3] Lewis G. Pollock, Dennis M. O'Connor, Edward N. Gadsby, Jr., and
Alan L. Stanzler vs. The dataCon Companies, Inc.

CIVIL ACTION commenced in the First District Court of Eastern Middlesex on January 18, 1978.

CIVIL ACTION commenced in the Superior Court Department on May 23, 1980.

The cases were consolidated for trial in the Superior Court Department and were heard by *John Paul Sullivan, J.*, on a master's report.

The Supreme Judicial Court granted a request for direct appellate review.

*Joseph L. Kociubes* for John A. Marshall & another.

*Regina E. Roman (Edward J. Barshak* with her) for Lewis G. Pollock & others.

HENNESSEY, C.J. The plaintiffs, partners of a Massachusetts law firm,[4] filed actions for attorneys' fees against the defendants, The dataCon Companies, Inc. (company), and John A. Marshall, the administrator of the estate of Albert J. Marshall (Marshall). In their counterclaims, the defendants sought rescission of five transactions involving the company, Marshall, and the plaintiffs. The defendants alleged the transactions involved overreaching. The defendants also alleged that, in each transaction, one or more of the plaintiffs violated the duty owed to clients by attorneys. The actions were consolidated upon the defendants' motion and referred to a master. The master found for the plaintiffs on their claims for attorneys' fees. On the counterclaims, the master found only one transaction was tainted by a breach of fiduciary duty.[5] He found no impropriety in connection with the other four challenged transactions. A Superior Court judge allowed the plaintiffs' motion to adopt the master's report and entered judgments accordingly.

---

[4] Mr. Alan L. Jacobs was not a plaintiff in Lewis G. Pollock & others *vs.* The dataCon Companies, Inc., but was a partner of some plaintiffs in that action during the period the challenged transactions occurred.

[5] This transaction involved an employment contract between Mr. Jacobs and the company entered into shortly after Marshall's death. While Mr. Jacobs took no steps to enforce the agreement once Marshall's heirs indicated their desire to repudiate it, the master allowed the company a set-off in the amount of $2,500, plus interest, against what it owes the plaintiffs. This amount represents one payment made to Mr. Jacobs under the employment agreement. The plaintiffs do not appeal this set-off.

The defendants filed a notice of appeal and sought direct appellate review, which we granted. On appeal, the defendants challenge only that part of the judgments dismissing the four counts of their counterclaim.[6] We affirm.

The subsidiary findings contained in the master's report are not contested, and we summarize them. The plaintiffs at all relevant times were partners in a law firm of general practice with an emphasis on corporate and securities matters. Mr. Jacobs specialized in such matters and, in addition to providing traditional legal advice to his clients, provided business and financial planning services to a number of young, growing companies.

dataCon is a Massachusetts corporation. From its incorporation in 1971 through July 20, 1977, the company was engaged in wire wrapping of electrical control and assembly panels for customers involved in independent telecommunications, computer guidance, and printing. Marshall was the founder, president, and treasurer of the company. He was primarily in charge of the technical and production aspects of the company's business. Albert R. Hughes was, until the time of certain transactions described below, the majority stockholder in the company. Marshall's initial understanding with Hughes was that Hughes would be responsible for obtaining the financing necessary for the company's anticipated growth. Marshall remained president and chief executive officer of the company until his sudden and unexpected death on June 25, 1977, at the approximate age of forty-six. The master found that Marshall was intelligent, financially prudent, and a strong administrator who had been described by the defendants' only witness as "no pushover." In addition, the master found that there was "absolutely no suggestion anywhere in the record that [Marshall] suffered from any physical, mental or emotional disability which would have precluded him from understanding the financial transactions" which the defendants seek to rescind.

---

[6] The defendants raised before the master allegations that Mr. Jacobs also had breached his duty as a director of the company to its shareholders. This issue is not raised in the defendants' appeal and we do not address it.

The plaintiffs' firm was retained as general counsel to the company in 1972, and continued as such until shortly after July 12, 1977. Marshall and Mr. Jacobs first met during the summer of 1972 when Mr. Jacobs was asked by a third party to review a proposed financing arrangement which Marshall was about to enter. Mr. Jacobs found the proposed financing agreement unsatisfactory because of the high interest rate to be charged and because the lender insisted on receiving an equity interest in the company. Based on Mr. Jacob's advice, the proposed financing agreement was terminated and Marshall retained Mr. Jacobs to try to obtain an alternate source of financing. Within ten days, Mr. Jacobs secured a line of credit which did not require the transfer of any equity interest in the company. Mr. Jacobs also negotiated a sale of 20,000 shares of the company's stock owned by Hughes to Marshall at ten cents per share. Marshall wanted this reallocation of equity interest because he felt Hughes had become inactive in the business and had failed to fulfil his role of a financial manager who would accommodate the company's growth needs. This sale gave Marshall and Hughes equal equity interest in the company. On February 13, 1973, Mr. Jacobs became a director of the company.[7] From the summer of 1972 until July 19, 1973, Mr. Jacobs billed the company at his hourly rate as an attorney.

Between 1973 and 1977, Marshall, Mr. Jacobs, and Mr. Jacobs's law partners entered into four transactions which the defendants claim were impermissible: (1) Marshall's transfer of stock in the company to Washington Associates, a partnership established by Mr. Jacobs and his law partners, and subsequent transfers of stock; (2) the sale of the company's stock by Mr. Jacobs's law partners to Marshall; (3) a pledge of the company's stock by Mr. Jacobs; and (4) an investment by Marshall in an entertainment agency controlled largely by Mr. Jacobs. We summarize the master's subsidiary findings on each transaction separately.

---

[7] From February 13, 1973, until June 25, 1977, the date of Marshall's death, the directors of the company were Marshall, Mr. Jacobs, and the company's bookkeeper, Martha Lever.

I. *Transfer of Company Equity Ownership to Washington As-
sociates.*

In the spring of 1973, Marshall became concerned with
various aspects of the equity structure of the company. Marshall
wanted to increase his equity ownership of the company to
greater than 50%, increase the equity interest held by certain
active employees, and eliminate the equity holdings of parties,
including Hughes, not actually involved in the company. Mr.
Jacobs negotiated a series of transactions to accomplish these
goals by mid-July, 1973. During this period, Marshall also
sought to involve Mr. Jacobs more closely with the company.
According to the master, "Marshall was extremely pleased
with the various financial transactions which Jacobs had
negotiated for the Company and for Marshall since the Summer
of 1972. Jacobs had, in essence, assumed the role of the financ-
ing 'partner' which Hughes had failed to fill. Marshall wanted
Jacobs to be a principal in the Company who would be com-
mitted to the continued growth of the Company. . . . The idea
of Jacobs' obtaining an equity in the Company was first brought
up by Marshall . . . ."

Marshall and Mr. Jacobs had several conversations over a
three-month period in which the subject of Mr. Jacobs's obtain-
ing an equity interest in the company was discussed. During
some or all of these conversations, Marshall and Mr. Jacobs
discussed the percentage of outstanding shares of the com-
pany's stock Mr. Jacobs would own, the price to be paid for
those shares, and the precise form of ownership which Mr.
Jacobs's equity interest would take. While these discussions
were taking place, Mr. Jacobs was functioning, in essence, as
the company's general counsel and Mr. Jacobs's firm was its
only corporate counsel. Mr. Jacobs did not advise Marshall to
refrain from transferring some of his stock in the company to
Mr. Jacobs. Similarly, he never advised Marshall or the com-
pany to obtain independent legal or other advice concerning
this proposed transaction. Marshall suggested that Mr. Jacobs
should own somewhere between 25% and 30% of the shares
which would be outstanding after the various transactions to be
made during the summer of 1973 were completed. Marshall chose

this range of equity ownership for Mr. Jacobs because it left Marshall with more than 50% of the equity in the company. The price to be paid by Mr. Jacobs for the shares of stock he was going to purchase from Marshall was not a negotiated price; it was not intended to be a reflection of the fair market value or book value of the company. The price was advantageous to Mr. Jacobs. It was established, however, in a manner which Mr. Jacobs and Marshall believed would provide favorable tax consequences for Marshall.

During these discussions, Mr. Jacobs informed Marshall that he and his law partners had formed a separate partnership known as Washington Associates which served as a vehicle for holding equity participation received by the law firm in client companies. By agreement among the partners in the law firm, any equity participation in a client company which any partner acquired was to be held by Washington Associates and owned by all the partners according to a ratio which changed annually. Mr. Jacobs also informed Marshall that shares of stock acquired by Washington Associates would ultimately be distributed to the individual partners in accordance with their internal distribution formula. While he would have preferred Mr. Jacobs to own the shares of stock in the company personally rather than through Washington Associates, Marshall understood and accepted the arrangement and agreed to transfer the shares in question to Washington Associates.

As a result of the various changes in stock ownership planned by Marshall and Mr. Jacobs in the spring and summer of 1973, Marshall was going to own greater than 50% of the outstanding stock in the company. Marshall, however, also sought a two-thirds majority voting control in the company. Accordingly, Mr. Jacobs, on behalf of Washington Associates, and Marshall agreed that Marshall would, for a period of five years, retain voting control of the shares of stock he was transferring to Washington Associates. That agreement was embodied in a July 19, 1973, letter of agreement between Marshall and Mr. Jacobs. Marshall and Mr. Jacobs did not discuss what effect, if any, the distribution of Washington Associates's shares to its individual partners would have on the agreement. On or about

July 19, 1973, Marshall sold Washington Associates 13,075 shares of his stock. These shares represent approximately 27% of the shares of the company outstanding when all the summer 1973 recapitalization transactions were complete.

Printed on each stock certificate was a restriction on transfer. The provisions of the restriction were not followed in the transfer of stock from Marshall to Washington Associates, from Washington Associates to Mr. Jacobs's law partners, or from one law partner to a third party.[8] No written consent or minutes of the board of directors of the company records a waiver of the stock restrictions with respect to shares transferred in these transactions.

At the time of these stock transfers Marshall owned a majority of the stock in the company and had control of the board of directors. He also was personally aware of the stock transfers and signed every stock certificate documenting those transactions. Mr. Jacobs explained to Marshall in detail the circumstances connected with the stock transfer between Mr. O'Connor and his brother-in-law before Marshall signed the certificate completing the transfer. Marshall was willing to accommodate Mr. O'Connor. At the time of the transfers at issue neither Mr. Jacobs nor any other lawyer in the firm advised Marshall or the company of the respective rights under the stock restriction. The master found that, during his lifetime, Marshall never challenged or raised any questions with respect to any of these transfers of stock either on his own behalf or on behalf of the company.

II. *Transfer of Company Equity Ownership from Washington Associates to Marshall.*

In the summer of 1974, Marshall, with Mr. Jacobs's help, engaged in a second program of restructuring the ownership of the company's stock. Marshall had learned during the previous year of the importance, in certain circumstances, of hav-

---

[8] Immediately following the receipt of 3,648 shares of the company's stock, Mr. Jacobs's law partner, Mr. O'Connor, transferred them to his brother-in-law to satisfy a $40,000 debt. On February 1, 1974, the company cancelled the stock certificate it had issued to Mr. O'Connor and issued one to his brother-in-law for 3,648 shares.

ing out-right ownership of two-thirds of the company's stock. Obtaining ownership of two-thirds of the company's stock was one of Marshall's goals in instituting the second program of restructuring. In addition, Marshall wanted to increase the percentage of stock owned by persons active in the company's business and to decrease the percentage of stock owned by individuals or entities who were not active in the company's management. Mr. Jacobs entered negotiations which led to the company's acquisition of equity interests from two shareholders. The company paid $3.60 per share for one shareholder's interests and $4.00 per share for that of the other. The master found the prices paid for the stock did not reflect the market value of the stock, as they were tied to other contractual obligations. The repurchases were approved by a unanimous vote of the board of directors.

After considering the effect of these repurchases, Marshall and Mr. Jacobs calculated that approximately 3,415 additional shares of stock would have to be redeemed in order to achieve the two-thirds ownership which Marshall wanted. Marshall wanted Mr. Jacobs to arrange for the redemption of the desired number of shares from those held by Washington Associates partners who were not actively involved in the management of the company's business. Marshall and Mr. Jacobs then discussed the appropriate way to fix a price per share to be used for the planned redemption of the shares from Washington Associates and two former company employees. Marshall and Mr. Jacobs did not consider the company's repurchases from the other shareholders relevant, since the negotiations surrounding those transactions involved considerations not germane in attempting to place a value on the stock. Rather, Marshall and Mr. Jacobs set an over-all value for the company of $600,000 based on the company's financial statements. This figure was actually a low valuation figure because the company was using a very high set of depreciation figures to reflect a large amount of equipment it had recently purchased. Based on the $600,000 figure, Marshall and Mr. Jacobs arrived at a $12 per share price to be paid for the shares in question. Mr. Jacobs then attempted to obtain the redemption of the needed shares of

stock from some of his Washington Associates partners. Mr. Jacobs explained to his partners the way in which he and Marshall had arrived at the $12 per share figure but did not attempt to negotiate the price with his partners. Eventually some shareholders agreed to redeem 3,415 shares at the $12 per share price. As a part of the inducement to redeem their shares, Mr. Jacobs and another partner transferred to these redeeming shareholders, for no consideration, the beneficial interest in certain of their own shares of the company's stock. Marshall was told about this transfer of beneficial interest but it was not recorded in the company's books. The board of directors unanimously authorized this redemption at $12 per share. Neither Mr. Jacobs nor any partner in the firm ever advised Marshall or the company to obtain independent legal advice concerning this redemption. After the redemption Marshall owned 65.055% of the company's outstanding shares.

III. *Mr. Jacobs's Pledge of Company Stock.*

As of December, 1976, Mr. Jacobs had guaranteed approximately $90,000 in loans made by the Commonwealth Bank and Trust Company to companies, unrelated to this company, with which Mr. Jacobs was affiliated. These companies were not meeting their income projections. Hence, the bank approached Mr. Jacobs, as a guarantor, and requested that he secure his guarantee. The bank requested that Mr. Jacobs pledge his shares of stock in the company to the bank. At that time, Mr. Jacobs owed between $550,000 and $600,000 to creditors, and he did not want to pledge his stock in the company to the bank.

On or shortly before December 17, 1976, Mr. Jacobs requested that the company's directors have a meeting to discuss this request from the bank. At the ensuing directors' meeting, Mr. Jacobs explained to Marshall and Lever the status of the various loans he had made or guaranteed, the bank's request that he pledge his company stock, and his own personal preference for not complying with that request. Marshall was concerned that Mr. Jacobs would lose his shares of stock involuntarily to a trustee in bankruptcy who might be obliged to sell them to an outsider — even to one of the company's com-

petitors. Accordingly, the directors decided that the best way to protect the company was to allow Mr. Jacobs to pledge the shares to the bank on the condition that if the bank acquired them, the company would be able to repurchase the shares at a predetermined price. In return, the company could require Mr. Jacobs to repurchase these shares from the company at the price the company paid the bank. The directors accepted $60,000 as the predetermined redemption price and Mr. Jacobs and the bank agreed. The master found that this price was not intended to reflect the market value of the 1,569 shares of the company's stock held by Mr. Jacobs.

At some time following commencement of litigation, the company did redeem the pledged stock from the bank for $33,000. The company has never asked Mr. Jacobs to repurchase those shares of stock from it in accordance with Mr. Jacobs's commitment to do so. At several points during the hearing before the master, Mr. Jacobs offered to purchase the shares either for $60,000 or for $33,000 plus interest. The company had not accepted this offer at the time the master filed his report. Mr. Jacobs did not advise the company or Marshall whether or not to approve the pledge arrangement. Similarly, Mr. Jacobs did not suggest that the company receive independent advice of outside counsel.

IV. *Marshall's Investment in Gemini Artists Management, Ltd.*

The final transaction between Mr. Jacobs and Marshall before us on appeal does not involve the company. Rather, it involves an entertainment booking agency, Gemini Artists Management, Ltd. (Gemini). In December, 1975, Mr. Jacobs was heavily involved with Gemini as an investor, officer, and general counsel. From the early stages of his relationship with Mr. Jacobs, Marshall had been interested in Mr. Jacobs's other financial dealings. Marshall was interested in Gemini, visited its offices, and asked Mr. Jacobs if he could invest in it. Marshall and Mr. Jacobs discussed such an investment and on January 26, 1976, Marshall purchased 2½% of Gemini's common stock.

From its inception until its eventual dissolution, Gemini operated at a loss. At the time of Marshall's investment, Gemini was

insolvent in that it was unable to meet its expenses out of its operating revenue. During their numerous discussions concerning Gemini, Mr. Jacobs had frequently asked Marshall to review Gemini's monthly operating statements and had sought Marshall's advice regarding Gemini's operations. At the time Marshall made his investment, Mr. Jacobs had shown Marshall all monthly operating statements for the calendar year 1975. Marshall fully understood that his investment in Gemini was highly speculative. Further, Mr. Jacobs made full disclosure of Gemini's financial condition and did not urge Marshall to make his investment in Gemini. Marshall lost his investment of $25,000 in Gemini and never received any dividend. Mr. Jacobs did not advise Marshall to obtain independent legal advice before making his investment in Gemini.

V. *Ultimate Findings.*

The master's ultimate findings on the defendants' claims that these transactions were improper are essentially identical. He found first that there was no overreaching or undue influence exerted by Mr. Jacobs as an attorney or by his law partners in any of the four transactions. In so doing, he found that there was no suggestion on the evidence presented to him that Marshall and Lever failed to understand the nature and consequences of the transactions. Second, he concluded that unless there is an absolute bar to an attorney's entering such financial arrangements with a client as occurred in this case without first recommending to the client that independent counsel be sought, he would not invalidate any of the transactions. The judge accepted both the master's subsidiary findings and these ultimate findings as his own.

The defendants disagree with the master and the judge. They contend the challenged transactions should be set aside for two reasons. First, they argue the plaintiffs had a professional duty as attorneys to Marshall and the company to advise them to obtain independent counsel before entering the transactions. Second, they assert the transactions should be voided because they are unfair and therefore involve a breach of the plaintiffs' duty. We find no merit in either of these arguments.

The scope of our review and that of the trial judge in cases referred to and reported by a master is well settled. Under Mass. R. Civ. P. 53 (e) (2), 365 Mass. 817 (1974),[9] the trial judge was required to accept the findings of the master unless they were clearly erroneous. See *Chase* v. *Pevear,* 383 Mass. 350, 359 (1981). "'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake had been committed.'" *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160 (1977), quoting *United States* v. *United States Gypsum Co.,* 333 U.S. 364, 395 (1948). We apply the same standard to the master's subsidiary findings of fact in determining whether the judge acted correctly in adopting them. See *Jones* v. *Wayland,* 374 Mass. 249, 254-255 (1978), *S.C.,* 380 Mass. 110 (1980). As to a master's ultimate findings, our review differs depending on whether we are considering ultimate findings of fact or conclu-

---

[9] The judge's order of reference to the master stated that "[h]e shall make findings of fact and conclusions of law, and set them forth in his report, including all subsidiary findings of fact upon each issue." Accordingly, the report was under Mass. R. Civ. P. 53 (e) (2).

Rule 53 of the Massachusetts Rules of Civil Procedure was modified by order of this court, dated May 25, 1982. The old language of rule 53 (e) was struck and a new rule 53 (h) (1) was inserted in its place. Rule 53 (h) (1), as amended, 386 Mass. 1237 (1982), provides as follows:

"(h) *Master's Report in Non-Jury Cases.*

"(1) *Status of Report.* In an action to be tried without a jury, the court shall accept the master's subsidiary findings of fact unless they are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master as a matter of law or are otherwise tainted by error of law. Any party who contends that the master's subsidiary findings are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master or are otherwise tainted by error of law must make such contentions by objection as hereinafter provided. The court may draw its own inferences from the master's subsidiary findings. The court may make findings in accordance with Rule 52, which are in addition to the master's findings and not inconsistent therewith, based either on evidence presented to the court or evidence before the master which was recorded by means approved by the master before commencement of the hearing."

This modified rule 53, however, is not applicable to the instant case. It applies only to orders of reference made on or after July 1, 1982. The orders of reference in the instant cases were entered on March 22, 1982. In any event, our result would be the same under the new language of the rule.

sions of law. Where the subsidiary findings of fact are reported, we review the master's ultimate findings of fact by considering them in light of the independent inferences we draw from the subsidiary findings. "Indeed, where subsidiary findings are reported by the master, both the trial judge and the appellate court are obligated to draw their own inferences from these findings." *Id.* at 255. See *USM Corp.* v. *Marson Fastener Corp.,* 379 Mass. 90, 92 n.3 (1979); *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659, 660 (1975); *Corrigan* v. *O'Brien,* 353 Mass. 341, 346 (1967). Nevertheless, "general findings, so far as they are findings of fact, will not be disturbed unless clearly erroneous." *Chase* v. *Pevear,* 383 Mass. 350, 360 (1981). To the extent that the master's ultimate findings are conclusions of law, they are subject to independent judicial review. *Lucey* v. *Hero Int'l Corp.,* 361 Mass. 569, 571 (1972). "We must apply our own view of the law, and we must consider whether the master's general findings, on a correct view of the law, are consistent with his subsidiary findings." *Chase* v. *Pevear, supra* at 359-360.

The defendants do not contend that the master's subsidiary findings are clearly erroneous. We therefore accept the findings and turn to consider whether the master's ultimate findings are proper in light of his subsidiary findings and the controlling law.

Attorneys are held to a high standard of fair dealing when entering transactions with their clients. That "[u]nflinching fidelity to their genuine interests is the duty of every attorney to his clients" is beyond question. *Berman* v. *Coakley,* 243 Mass. 348, 354 (1923). We have set aside transactions between attorneys and clients where that loyalty has been violated. See *Israel* v. *Sommer,* 292 Mass. 113, 124 (1935); *Webster* v. *Kelly,* 274 Mass. 564, 572 (1931). "It is a well settled rule in equity, applicable to all transactions between attorney and client . . . that the attorney who bargains with his client in a matter of advantage to himself must show . . . that it was in all respects fairly and equitably conducted." *Hill* v. *Hall,* 191 Mass. 253, 262 (1906). At issue here is whether the master's ultimate findings are correct in light of our assessment, based

on his subsidiary findings, of how fairly and equitably the challenged transactions were conducted.

The defendants first challenge a rule of law upon which the master's ultimate findings are conditioned and which was applied by the judge in reviewing them. The master found the challenged transactions did not involve overreaching or undue influence by the plaintiffs unless attorneys are absolutely prohibited from engaging in transactions with clients without first advising the clients to obtain independent advice. The judge adopted the master's ultimate findings stating that ''[o]n the basis of this report, as adopted by the Court, the Court finds and rules that there is no requirement of law which would mandate that a transaction between an attorney and a client be set aside in the absence of independent advice.'' The defendants disagree with this statement of law.

The defendants contend that an attorney violates his duty to a client whenever he contracts with a client who has no independent counsel and does not suggest the client obtain such counsel. They state that ''to deal with his client, (i) the lawyer must, at a minimum, suggest that the client obtain independent advice before entering the transaction and (ii) the transaction must be fair.'' Under this standard, a breach of duty would occur even where a transaction is fair if the attorney does not advise the client to obtain outside counsel. The standard establishes a per se rule: whenever an attorney enters a transaction with a client and fails to advise him to obtain outside counsel, the attorney will have violated his fiduciary duty to the client. We have not established such a per se standard in the past and we do not do so here.

That an attorney did not advise his client to seek independent advice before entering a business transaction with him is only evidence that the transaction was not conducted fairly and equitably and that the attorney violated his fiduciary duty. ''Any transaction between an attorney and his client when called in question must be subjected to careful scrutiny and the burden is upon the attorney to prove that any influence over the client which might be presumed to have arisen out of the relationship was neutralized by independent advice given

to the client *or by some other means* so that there was no overreaching of the client and no abuse of confidence. Whether that burden has been sustained depends upon the facts in each particular case'' (emphasis added). *Barnum* v. *Fay,* 320 Mass. 177, 181 (1946). See *Israel* v. *Sommer,* 292 Mass. 113, 123 (1935) (''[U]nless it appears that the presumed influence resulting from the relationship has been neutralized, by completely unselfish advice from the attorney, by independent legal advice from another, *or in some other manner,* the attorney cannot expect his bargain to stand'' [emphasis added]).

The master found here that Mr. Jacobs did not advise Marshall or the company to obtain independent counsel before entering the challenged transactions. The plaintiffs did, however, establish other facts which tend to negate any presumption that the transactions were unfairly or inequitably conducted. First, Marshall was found to have had full knowledge of, understood, and consented to all the transactions. There is no evidence he objected to them. Moreover, the master found Marshall was ''bright, financially prudent, and a strong administrator who was described . . . as 'no pushover.' '' Second, the transactions were found, as a matter of fact, not to have involved any overreaching or undue influence by the plaintiffs. At issue is whether these facts, as established, suffice to negate any presumption of undue influence. We think that they do.

The defendants' reliance on our decision in *Israel* v. *Sommer,* 292 Mass. 113, 124 (1935), is misplaced. In *Sommer,* we voided a trust agreement between an eighty year old businessman and an attorney who worked for him. In that case there was no finding of fact that the client knew of and understood all aspects of the transaction. Rather, there was considerable evidence that he was reluctant to enter or recognize the transaction. The instant case is different. Marshall was an intelligent, young businessman who understood all the challenged transactions and never evidenced any disapproval of them. Similarly, the Appeals Court's decision in *Goldman* v. *Kane,* 3 Mass. App. Ct. 336 (1975), does not support the defendants' position. In *Goldman,* the Appeals Court struck down a transaction between an attorney and his client, who had

attended law school, even though the attorney had suggested that the client not enter the deal. That case, however, turned on the Appeals Court's determination of the unfair and over-reaching nature of the transaction: "The fundamental unfair-ness of the transaction and the egregious overreaching by Kane in his dealings with Hill are self-evident." *Id.* at 342. No such overreaching or unfairness was found in the instant case.

The defendants' position derives no support from our disci-plinary rules governing the conduct of attorneys. S.J.C. Rule 3:07, DR 5-104 (A), as appearing in 382 Mass. 781 (1981), provides: "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure." There was full disclosure in the case at bar. Rule 3:07, DR 5-104 (A), does not require in all circumstances that a lawyer advise a client to obtain outside counsel before entering a transaction with the lawyer. Accord *In re Schuyler,* 91 Ill. 2d 6 (1982) ("While independent legal advice to a client, or advising the client to secure independent legal advice, may be a very compelling means of rebutting the presumption of undue influence, it is not an indispensible means"). Contra *In re Bartlett,* 283 Or. 487 (1978).

We conclude that in the circumstances of these cases the judge and master were correct in finding that the plaintiffs' failure to advise Marshall and the company to seek independent counsel before entering the challenged transactions did not constitute a breach of fiduciary duty.

The other basis upon which the defendants challenge the master's ultimate findings is that the challenged transactions in substance were unfair. They devote a considerable portion of their brief to demonstrating how the plaintiffs benefited from the transactions. In so doing, they are apparently arguing that the master's findings of no overreaching or undue influence by the plaintiffs cannot be upheld based on his subsidiary findings and the controlling law set forth *supra.* We disagree. Whether a transaction between an attorney and a client is ad-vantageous to the client is certainly important in reviewing

how fairly and equitably the transaction was conducted. Evidence of disadvantage to the client can make an attorney's burden to negate any presumption of undue influence or overreaching more difficult to bear. See *Israel* v. *Sommer,* 292 Mass. 113, 124 (1935); *Goldman* v. *Kane,* 3 Mass. App. Ct. 336, 342 (1975). In some circumstances the grossly unfair nature of an agreement between an attorney and a client alone may render it impossible for the attorney to meet his burden. That, however, is not the situation in this case.

Neither the master nor the judge made findings as to the over-all fairness of the transactions. They found only that the transactions involved no overreaching or undue influence by the plaintiffs. These findings alone do not establish whether the transactions were fair. Nonetheless, the master here reported his extensive subsidiary findings to the judge and they are part of the record before us. Upon review of these subsidiary findings, we may reasonably infer that the challenged transactions were not unfair. We so conclude.

Finally, anticipating our conclusions here, the defendants assert in their brief an alternate remedy to rescission of the transactions. They observe that the master found a breach of fiduciary duty by Mr. Jacobs. That breach was in connection with an employment contract between the company and Mr. Jacobs entered shortly after Marshall's death. The judge accepted the master's finding and entered judgment for the defendants on this counterclaim. The plaintiffs have not appealed the judgment. The defendants contend that because the plaintiffs violated their duty to the company when Mr. Jacobs entered this employment agreement, they should not be allowed to benefit from any appreciated value of their stock after the date of the breach. We disagree. The defendants have cited no case to us in which a breach of an attorney's duty in one transaction affects his ability to retain the appreciated value of stock obtained in a different, and earlier, transaction not tainted by the breach. The defendants already have obtained relief for Mr. Jacobs's violation of his duty to the company. No more is due them here. The plaintiffs did not violate their duty in obtaining and retaining their shares of the company.

*Judgments affirmed.*