ITT CORPORATION, Plaintiff,

v.

LTX CORPORATION, Defendant.

Civ. A. No. 88–0967–C.

United States District Court,
D. Massachusetts.

March 21, 1990.

Michael J. Liston, Palmer & Dodge, Boston, Mass., for plaintiff.

Joseph L. Kociubes and Richard Mentzinger, Jr., Bingham, Dana & Gould, Boston, Mass., for defendant.

## MEMORANDUM

CAFFREY, Senior District Judge.

This case is a civil action brought by the plaintiff, ITT Corporation ("ITT"), against the defendant, LTX Corporation ("LTX") for breach of contract.[1] ITT alleges that LTX failed to accept delivery of 479 cable assemblies pursuant to a written contract between the parties. ITT seeks the cost of the cable assemblies, approximately $540,-000, in damages.

This case was tried before the Court without a jury over four days in November and December 1989. The Court heard the testimony of six witnesses, viewed a videotape, and examined numerous documents and cable assemblies introduced in evidence. The plaintiff and defendant also submitted an agreement as to certain stipulated facts in this case. After the trial, the plaintiff and defendant submitted proposed findings of fact and briefs concerning the legal issues in the case. Based on a careful review of the evidence at trial and the papers submitted, this Court now makes the following findings of fact and conclusions of law.

### I. Findings of Fact

1. The plaintiff, ITT, is a Delaware corporation with its principal place of business in the city and state of New York. ITT conducts a portion of its business through an unincorporated division known as ITT Cannon.

2. ITT Cannon manufactures and distributes electrical connectors and connector assemblies. An electrical connector is a fitting that joins with another fitting or receptacle to make a circuit. In its simplest and most common form, an electrical connector is an electrical plug.

3. ITT Cannon produces sophisticated forms of electrical connectors. One of ITT Cannon's products is a patented low insertion force multiple-wire power and signal connector known as a DL Connector. The DL Connector involved in this action is a commodity item that ITT Cannon sells in the commercial computer and peripheral equipment marketplaces.

4. The defendant, LTX, is a Massachusetts corporation with its principal place of business in Westwood, Massachusetts. LTX manufactures and distributes sophisticated semiconductor testing equipment. LTX's test equipment is used to test semiconductors at different stages of manufacturing. This equipment often costs in excess of $500,000 for a testing unit. Its customers are major electronics firms around the world.

5. The dispute between ITT and LTX involves a product called a TS 88 test head cable and harness assembly (the "TS 88 cable assembly"). LTX manufactures a model of semiconductor testing equipment known as the TS 88. The TS 88 cable assembly is a cable and electrical connector assembly used in the TS 88 model. The TS 88 cable assembly is used to connect LTX's testing equipment to a test head which then tests a semiconductor device.

6. The complete TS 88 cable assembly is a special purpose item which has virtually no functional use or market value except in connection with the LTX testing equipment. LTX does not manufacture this component of its equipment. LTX has historically looked to others manufacturers to provide the cable and connecter and to assemble those parts to produce the TS 88 cable assembly.

7. Prior to September 1983, LTX did not use TS 88 cable assemblies. The cable assemblies then in use were less sophisticated cable assemblies known as CMO–2 cable assemblies. The CMO–2 cable assemblies were made either by W.L. Gore & Associates ("Gore") using cable manufactured by Gore and connectors made by ITT Cannon or by ITT Cannon using Gore cable and its connectors.

8. In 1983, LTX decided to alter the design of its testing equipment which led to the development of the TS 88 model and the TS 88 cable assemblies. LTX wanted to enlarge the electronic capabilities of its testing equipment and therefore wanted to

---

**1.** In its complaint, ITT had originally also sued for violation of Mass.Gen.L. ch. 93A, but ITT has since waived this claim and has only pursued the breach of contract claim.

redesign its test heads and test head cables. Gore designed a new cable for LTX to use in the TS 88 cable assembly. LTX is the owner of the design criteria for the new Gore cable. As with the cable assembly, the cable itself has virtually no functional use or market value except in connection with LTX equipment.

9. During the summer and fall of 1983, ITT Cannon and LTX negotiated an agreement whereby ITT Cannon would produce the new TS 88 cable assemblies. The TS 88 cable assemblies were to be assembled by ITT Cannon utilizing its own patented electrical DL connectors and the newly designed Gore electrical cable. On September 22, 1983, LTX issued a purchase order to ITT Cannon for 1,600 fully assembled TS 88 cable assemblies.

10. The Gore cable used for the new assemblies was a single cable with the cable jacket opened at each end splitting the wires into two bundles. Each bundle entered at one side of a plastic backshell covering the area where the wires made contact with the ITT Cannon electrical connector. The splitting of the cable for entry on two sides of the backshell created a "Y" junction near each end of the cable assembly. The cable assemblies produced pursuant to this purchase order did not perform satisfactorily, and LTX received numerous customer complaints about the cable assembly failures.

11. In the spring of 1984, LTX, ITT Cannon, and Gore discussed the breakage problems of the first TS 88 cable assemblies. Gore suggested changing the cable from a one-cable design to a dual-cable design in order to relieve strain on the "Y" joint. This suggestion was ultimately adopted. ITT Cannon produced amended engineering drawings, routings, and parts lists to produce the dual-cable assemblies.

12. Because of the problems with the one-cable designs, the delivery and payment schedule of the initial purchase order was modified and the one-cable design discontinued. On October 22, 1984, LTX issued a new changed purchase order to ITT Cannon for 4,149 TS 88 cable assemblies using the dual-cable design. The new purchase order contemplated a schedule of weekly deliveries commencing in October 1984 and terminating in July 1985.

13. This dual-cable TS 88 assembly is the particular cable assembly at issue in this case. This TS 88 cable assembly is comprised of two electrical cables, each six feet in length, containing in combination 155 insulated wires and several drain wires. The individual wires and the related insulation of each wire are surrounded and jacketed by a polyurethane cover to form the cable.

14. Each end of each cable—the cables are essentially in parallel—is attached to an ITT Cannon connector with 156 contacts. Each of the 155 wires in the cable is individually crimped to one of the connector contacts. The drain wires are assembled together and crimped to the 156th contact of the connector. In some of the assemblies, a 156–contact ITT Cannon connector is used at one end and a 96–contact ITT Cannon connector is used at the other end. In these assemblies, only 96 of the wires are crimped at the 96–contact end. With a connector at each of the ends, the two-cable assembly will function as a single cable with 156 or, in the alternative form, 96 separate contacts.

15. The area around the ITT Cannon electrical connector where the individual wires and corresponding contacts are crimped is covered with a plastic backshell. The backshell is approximately one inch thick, four inches wide, and two inches long. The bottom of the backshell is cut at angles on each side where the cables enter so that the two cables enter approximately three inches apart.

16. There is a strain relief mechanism where the cables enter near the backshell. This mechanism is intended to relieve the strain placed on the area where the individual electrical strands are connected to the contacts when the cable is flexed.

17. The strain relief includes polyolefin heat-shrinkable sleeving, extending from within the backshell to two inches from the point the cables enter the backshell. The sleeving wraps around each cable. It also includes a stainless steel clamp, attached to

each side of the backshell and wrapped around each cable just outside the backshell. The clamp holds the cable in place.

18. Several additional outer jacket polyolefin rubberlike strips, each about two inches in length, wrap around the two cables like wide, firm rubber bands, beginning about eight inches from the bottom of each backshell. These strips hold the two cables side by side through the balance of the cable length.

19. Deliveries and payments for the new dual-cable design continued in accordance with the second purchase order. On March 12, 1985, however, LTX issued a change order modifying the delivery schedule and extending its completion date from July 1985 to October 1986. In October 1985, LTX placed a hold on all further deliveries.

20. LTX ceased accepting deliveries because, at least in part, its customers were experiencing cable failures. Wires were breaking within the cables, generally two to five inches outside the area of strain relief. At the time LTX ceased accepting deliveries, ITT Cannon had an inventory of completed dual-cable design TS 88 assemblies and also raw Gore electrical cable not yet incorporated into TS 88 cable assemblies.

21. ITT Cannon does not contend and has not contended that the dual-cable design TS 88 assemblies produced under the second purchase order are in fact adequate for use with LTX equipment. There was a dispute between the parties, however, as to the responsibility for the failures of the cable assemblies. Despite lengthy negotiations and attempts to deal with the apparent problems, the parties were unable to resolve their contract differences without resorting to litigation.

22. On June 3, 1986, ITT Cannon commenced suit against LTX in this Court for breach of contract and for violation of Mass.Gen.L. c. 93A.—*ITT Corporation v. LTX Corporation*, Civil Action No. 86–1696–C. LTX answered and counterclaimed; ITT answered the counterclaim.

23. ITT Cannon asserted that it produced the cable assemblies in accordance with LTX specifications and instructions. Although ITT Cannon admitted that LTX was experiencing problems with the dual-cable design TS 88 assemblies, ITT Cannon denied that any of those problems were attributable to its work or materials.

24. LTX, on the other hand, asserted that ITT Cannon designed the TS 88 cable assembly and that the cable assemblies were defective because of failures in the ITT Cannon design, materials, and workmanship. Therefore, LTX claimed that ITT Cannon breached implied warranties of merchantability and fitness for the intended use of the product.

25. While the suit was pending, LTX was attempting to isolate the causes of the apparent defects in the cable assemblies and find ways to correct the problems. Both ITT Cannon and Gore participated in these attempts. At the same time, ITT Cannon and LTX were attempting to settle their lawsuit.

26. On December 11, 1986, representatives of ITT Cannon and LTX met at ITT Cannon's facility in Fountain Valley, California to discuss the cable failures in the context of attempting to resolve the pending litigation. LTX was represented at the meeting by Lee Hawkins, Director of Quality Assurance; Kevin O'Keefe, Field Service Manager; and John Aldeborgh, Director of Materials. ITT Cannon was represented by Clifford Kahn, Marketing Manager; David Goodman, Director of Engineering; Lamont Seitz and James Moore, both ITT engineers.

27. As part of the meeting, the parties visited Silicon Systems Incorporated ("Silicon Systems")—an LTX customer in Tustin, California, that had experienced numerous cable failures—to observe the environment and applications of the TS 88 cable assemblies on location. At Silicon Systems, the TS 88 cable assemblies were used in a many applications which required constant connecting and disconnecting of the assemblies. In the process, the assemblies were constantly bent and twisted. Silicon Systems provided ITT Cannon with five

failed cable assemblies for ITT Cannon to analyze.

28. Following the visit to Silicon Systems, the parties discussed two possible revisions to the TS 88 cable assembly design. First, Kevin O'Keefe, an LTX representative, stated that the relatively tight fit of the jacket on the Gore cable could contribute to the cable failures. O'Keefe suggested that the outer jacket on the Gore cables could be removed and expando sleeving, a very elastic jacket, could be placed over the inner wires. Second, the parties discussed a design using the same Gore cable, but with a dual durometer boot—a sleeve made by melding two different rubber compounds. This boot would act as a strain relief which would extend out longer than the strain relief on the cable assemblies manufactured by ITT Cannon, thereby increasing the cable's bending radius. The ITT Cannon representatives at the meeting avoided making any suggestions themselves and intentionally avoided doing or saying anything to accept any responsibility for the TS 88 cable assemblies.

29. At the conclusion of the meeting, ITT Cannon agreed to submit a quote for reconstructing the cable assemblies in a new design. ITT would remove the outer jacket of the Gore cable, replace it with a very elastic jacket, and incorporate a dual durometer strain relief. ITT Cannon also agreed to make drawings of the new design, later made by ITT Cannon engineer James Moore who was present at the meeting December 11, 1986 meeting. The modifications to the TS 88 cable assemblies reflected by these drawings became known as Revision A.

30. After the December 11, 1986 meeting, the parties continued to discuss settlement, and there was correspondence between them reflecting these discussions. Finally, on May 6, 1987, LTX and ITT Cannon entered into an agreement to settle their lawsuit. This May 6, 1987 agreement is the subject of this present lawsuit.

31. The form of the agreement was a letter from William P. Sekeres, a vice president of ITT Cannon, to Richard Boltrus, a vice president at LTX. Dated May 6, 1987, the letter expressed Sekeres's understanding of the terms of an agreement reached the previous day.

32. The May 6, 1987 agreement reads as follows:

May 6, 1987

Mr. Richard Boltrus
Vice President, Administration
LTX Corporation
LTX Park at University Avenue
Westwood, Massachusetts 02090–2306

Dear Dick:

This is to confirm in writing the agreement we reached yesterday. What follows is my understanding of that agreement. Your signature will reflect that our understandings coincide and this letter will constitute our agreement.

The inventory at Cannon of cable and cable assemblies that are the subject of the current litigation between us is as follows:

| Item | Cannon P/N | Quantity | Description |
|---|---|---|---|
| 1 | 970–0008–478 | 1,183 | CORE Cable P/N NR RCN4982–1 |
| 2 | 970–0008–479 | 1,532 | CORE Cable P/N RCN4983–1 |
| 3 | 111620–0008 | 313 | TS88 Assem. DL156 to DL156 |
| 4 | 111620–0009 | 166 | TS88 Assem. DL156 to DL96 |
| 5 | 111620–0007 | 2 | TS88 Single Cable Assembly |

Except for Item 5 which Cannon will keep and which is not a subject of this agreement, LTX will take delivery of and pay for the inventoried cables and assemblies in accordance with the following schedule:

| Item | Description | Quantity Shipped | Price Each | Extended Price | Ship Date | Payment Terms |
|---|---|---|---|---|---|---|
| 1 & 2 | 970–0008–478 | 592 | $314 | $185,888 | 5/8/87 | COD/Bank Trf. |

| Item | Description | Quantity Shipped | Price Each | Extended Price | Ship Date | Payment Terms |
|------|-------------|------------------|-----------|----------------|-----------|---------------|
|  | 970–0008–479 | 592 | $314 | $185,888 | 5/8/87 | COD/Bank Trf. |
|  | Subtotal | 1184 |  | $371,776 |  |  |
| 1 & 2 | 970–0008–478 | 591 | $322 | $190,302 | 8/5/87 | Net 30 days |
|  | 970–0008–479 | 591 | $322 | $190,302 | 8/5/87 | Net 30 days |
|  | Subtotal | 1182 |  | $380,604 |  |  |
| 3 & 4 | 111 620–0008 | 157 | $1,224 | $192,168 | 11/5/87 | Net 30 days |
|  | 111 620–0009 | 83 | $1,224 | $101,592 | 11/5/87 | Net 30 days |
|  | Subtotal | 240 |  | $293,760 |  |  |
| 3 & 4 | 111 620–0008 | 156 | $1,272 | $198,432 | 2/5/88 | Net 30 days |
|  | 111 620–0009 | 83 | $1,272 | $105,576 | 2/5/88 | Net 30 days |
|  | Subtotal | 239 |  | $304,008 |  |  |

---

In addition, LTX will pay $18,100 non-recurring tooling and tooling use charge for Revision "A" modification net 30 days after invoice from Cannon.

Part numbers used in the above schedule are the part numbers currently in use. Mutually agreed upon modifications to these assemblies may result in part number changes. Cannon will inform LTX of any part number changes.

Prices used in above schedule include $124 each for Cannon incurred costs to modify existing cable assemblies to conform to "Revision A" specifications as presented by LTX (see Cannon Drawing No's R 86002–000 and R 86002–1000) or to design currently being produced for LTX by Wire Tech Corp. of Florida. Price changes for any other modification proposed by LTX will be subject to mutual agreement. LTX will have the right to perform any modification at their facility or any facility they designate, in which case the prices for the assemblies included in the above schedule will be reduced by $124 each. Regardless of the alternative selected by LTX, LTX shall accept delivery of the cable assemblies and pay for them in accordance with the schedule above.

At the time of shipment the cable assemblies will conform to the following acceptance test criteria:

(1) 100% of cable assemblies will have continuity and short testing using Cox Digitrace Equipment.

(2) 100% of cable assemblies will have hi-pot testing with each conductor to all other conductors and shield, 200 VRMS, 60 HZ using ITT Cannon's custom hi-pot test system.

(3) 100% of cable assemblies will be tested for continuity while subjected to flexing stress. The cable is exercised in a circular pattern while observing 156 indicator lights on a special test fixture. This test insures that no wires are broken and that there are no intermittent conditions.

All cable assemblies modified to LTX's "Rev. A" requirements, to Wire Tech design or to other LTX requirements shall be subject to the standard Cannon terms and conditions of sale.

If all this is mutually acceptable, our attorneys will work out a dismissal of the pending litigation between us.

If this letter reflects your understanding of our agreement, please sign and return the duplicate copy of this letter.

ITT Cannon, a division of
    ITT Corporation

s/n _____
W.P. Sekeres
Vice President, General Manager
Components Division

Accepted this day

of

LTX Corporation

**1232**

s/n _____

Richard Boltrus
Vice President, Administration

33. The May 6, 1987 agreement did not include any additional documents or pages other than the letter. The "standard Cannon terms and conditions of sale" referred to in the agreement were not attached to the letter. In previous correspondence, ITT Cannon representatives had provided LTX with a copy of the standard terms and conditions of sale referred to in the letter. The May 6, 1987 letter was drafted by representatives of ITT Cannon.

34. Both Sekeres and Boltrus signed the agreement. On June 1, 1987, in keeping with the agreement, the parties filed a stipulation of dismissal with prejudice of the first lawsuit, Civil Action 86–1696–C.

35. The current litigation between the parties involves a dispute over the obligations imposed by the terms of the May 6, 1987 agreement. The parties, however, do agree with respect to the following provisions of the agreement.

36. First, the May 6, 1987 agreement dealt with the disposition of ITT Cannon's inventory of both raw Gore electrical cable and completed TS 88 cable assemblies. Two single-cable assemblies within the inventory were not a subject of the agreement. There were two types of raw Gore cable in the inventory. The agreement called for shipments to LTX in May and August of 1987, and for payment of the first shipment "COD" and of the August shipment within thirty days thereof. The unassembled Gore cable was shipped by ITT Cannon and LTX paid for the cable in accordance with the May 6, 1987 agreement. The price that LTX paid for the raw Gore cable exceeded ITT Cannon's purchase cost of the cable from Gore.

37. Second, the May 6, 1987 agreement contemplated a modification of the existing completed TS 88 cable assemblies to conform to the Revision A specifications. The reference in the agreement to the ITT Cannon drawings, numbered R 86002–000 and R 86002–1000, is a reference to drawings produced by James Moore reflecting the revisions discussed at the December 11, 1986 meeting of ITT Cannon and LTX engineers.

38. Third, the May 6, 1987 agreement required LTX to pay ITT Cannon a one-time tooling and tooling use charge of $18,-100 for the contemplated Revision A modifications. LTX has paid these tooling costs in accordance with the agreement.

39. Fourth, the May 6, 1987 agreement stated three "acceptance test criteria" that the cable assemblies were required to meet. The parties agree and there is no dispute that the first two of these criteria were satisfied by the Revision A cables.

40. The central dispute between the parties in this litigation involves the third of the acceptance test criteria in the agreement. This third acceptance test criterion was not part of any previous agreement or purchase order between ITT Cannon and LTX. The parties agreed to the language of acceptance criterion three only after the December 11, 1986 meeting and after further negotiation and discussion as to the Revision A cable assembly design.

41. Although not specifically set forth in the agreement, the parties agreed that ITT Cannon would initially provide LTX with samples of new cable assemblies modified to the Revision A specifications. LTX would then evaluate the new Revision A cable assemblies using its own testing equipment. After LTX tested such samples, ITT Cannon would then modify the remaining existing cable assemblies in inventory.

42. At the time of the May 6, 1987 agreement, the parties had not agreed on a specific flexing test procedure. LTX had plans for and later constructed a "cable flex tester" which was ultimately used to test the Revision A cable assemblies. ITT Cannon had a flex testing procedure which it had used in the past, but LTX did not know of this testing procedure. The only flex tests described in writing between the parties were those set forth in the third acceptance test criterion of the May 6, 1987 agreement.

43. Following the May 6, 1987 agreement, ITT Cannon modified ten of the TS 88 cable assemblies in accordance with the Revision A specifications. In the fall of 1987, those samples were forwarded to LTX. Then, LTX subjected the modified Revision A cable assemblies to a flexing test using its newly constructed cable flex tester.

44. On November 30, 1987, Ramesh D. Raju, LTX's Component Engineering Manager, wrote a letter to Cliff Kahn of ITT Cannon, enclosing a report concerning the testing of the Revision A samples. LTX concluded from the flex testing that the new Revision A design did not produce a sufficiently reliable TS 88 cable assembly. On December 21, 1987, Mr. Raju again wrote to Mr. Kahn with results of LTX's testing of the Revision A cable assemblies.

45. LTX returned five of the Revision A cable assemblies that failed the LTX flexing tests for further analysis by ITT Cannon. ITT Cannon performed its own analysis and transmitted its results to LTX. Through the winter, LTX and ITT Cannon disputed whether LTX must accept the Revision A cables.

46. On March 9, 1988, G. Donald Haarer, general counsel to ITT Cannon, wrote a letter to Richard Boltrus of LTX demanding acceptance of delivery and payment for ITT Cannon's remaining inventory of the TS 88 cable assemblies. LTX has since refused to take delivery or pay for the modified cable assemblies.

47. On April 27, 1988, ITT Cannon initiated this second lawsuit against LTX for breach of the May 6, 1987 settlement agreement and alleged violation of Mass. Gen.L.c. 93A—Civil Action No. 88-0967-C. ITT Cannon has since waived its claims under Mass.Gen.L. c. 93A.

48. LTX has accepted delivery of and paid about $750,000 for ITT Cannon's inventory of raw cable under the terms of the settlement agreement. LTX has also paid in full the $18,100 in retooling costs contemplated by the May 6, 1987 agreement. But, to this date, LTX has not accepted delivery of or paid for any of the inventory of completed dual-cable design TS 88 assemblies.

49. There remain 479 completed TS 88 cable assemblies in ITT Cannon inventory. None of these cable assemblies have been modified in accordance with Revision A specifications. Under the settlement agreement, if LTX were required to purchase these cable assemblies, the prices, exclusive of interest, would be $538,372.

50. As noted above, both LTX and ITT Cannon have flex tested the Revision A cable assemblies using their own separate procedures. Under the ITT Cannon test procedure, as demonstrated by videotape, each of the cable assemblies was subjected to a continuity and short test using Cox Digitrace equipment pursuant to test criterion one. This equipment scans the individual wires of the electrical cable to identify all broken wires, shorts, or wrong connections.

51. ITT Cannon then tested for flexing stress by attaching each cable assembly to the Cox Digitrace equipment and testing for continuity while the cable was exercised in a circular pattern while under the stress of a flexed position. ITT Cannon designed the procedure only to test the continuity of the cable assembly while in flexed positions and not to test the flexing endurance of the cable assembly. ITT Cannon has used this test procedure since it first started making the TS 88 cable assemblies for LTX.

52. ITT Cannon has tested the Revision A cable assemblies and all the remaining TS 88 cable assemblies using its flexing test procedure. The parties do not dispute that the Revision A cable assemblies passed ITT Cannon's flexing test procedures.

53. Following the May 6, 1987 agreement, as was contemplated by the parties, LTX designed a flex tester to analyze the new Revision A cable assemblies. Under this test procedure, one circular rotation of the cable assembly is counted as one flex. The flex tester can detect, during any one flex, whether any of the electrical strands within the cable assembly breaks. The cable assemblies were continuously flexed in the LTX cable flex tester until there was a

failure, and then the number of flexing rotations before failure were counted.

54. LTX designed its cable flex tester to test the flexing endurance of the cable assemblies. LTX desired to determine whether the cable assemblies could adequately endure bending and flexing when in use by LTX customers. The LTX tester was not designed simply to test the electrical continuity of the cable assemblies while in a flexed position.

55. After testing, LTX concluded that the modifications to the Revision A cable assemblies did not significantly improve upon the original TS 88 cable assemblies. LTX concluded that the Revision A cable assemblies were not reasonably capable of withstanding the flexing stress from use by LTX customers in a commercial context. ITT Cannon does not dispute these conclusions.

56. Upon review of the testing procedures, the evidence at trial, and the stipulations of the parties, this Court further finds the following facts. The TS 88 cable assemblies, modified by ITT Cannon and sent to LTX in the fall of 1987, did conform to the Revision A specifications as drawn by ITT Cannon. The modified Revision A cable assemblies, however, were not and are not commercially acceptable for use in LTX's TS 88 semiconductor testing equipment.

## II. Conclusions of Law

### A. Jurisdiction and Applicable Law

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The plaintiff, ITT, is a Delaware corporation and the defendant, LTX, is a Massachusetts corporation which satisfies the diversity of citizenship requirement for federal jurisdiction. The amount in controversy is $538,372 exclusive of interest which satisfies the requirements for federal jurisdiction.

The law of the Commonwealth of Massachusetts controls the substantive legal matters of this diversity action. *Erie Railroad Co. v. Tomkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). This action is for breach of contract in Massa-chusetts, and acting under federal diversity jurisdiction this Court shall apply local state contract law to this case.

### B. Application of the Uniform Commercial Code

■ This contract dispute is governed by the applicable provisions of the Uniform Commercial Code ("UCC") as adopted in Massachusetts. Article two of the UCC applies to "transactions in goods." Mass. Gen.L. ch. 106, § 2–102. The UCC defines goods as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale...." Mass.Gen.L. ch. 106, § 2–105. A contract for the rendition of services, however, is not covered by the UCC. *See White v. Peabody Construction Co., Inc.*, 386 Mass. 121, 132, 434 N.E.2d 1015 (1982); *Cumberland Farms, Inc. v. Drehmann Paving & Flooring Co.*, 25 Mass.App.Ct. 530, 534, 520 N.E.2d 1321 (1988). Where a contract is mixed, involving both the sale of goods and the rendition of services, "the test is whether the predominant factor, thrust, or purpose of the contract is (1) 'the rendition of service, with goods incidentally involved, ... or is [instead (2) ] a transaction of sale, with labor incidentally involved....'" *Cumberland Farms*, 25 Mass.App.Ct. at 534, 520 N.E.2d 1321 (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974)). *See also White*, 386 Mass. at 132, 434 N.E.2d 1015 ("Contracts whose predominant factor, thrust, or purpose is the rendition of services are not within the scope of art. 2."); *Zapatha v. Dairy Mart, Inc.*, 381 Mass. 284, 290 n. 8, 408 N.E.2d 1370 (1980).

■ In this case, the agreement at issue between the parties was drafted on May 6, 1987, and it is recited in full at paragraph 32 above. The subject matter of the agreement, as drafted, is 2,715 pieces of GORE electrical cable at a price of $752,380 and 479 TS 88 cable assemblies at a price of $597,768. The cable pieces are clearly moveable commercial goods and make up more than half of the contract value. Furthermore, the cable assemblies are made up of the same pieces of Gore electrical cable attached to special electrical connec-

tors manufactured by ITT Cannon. Even though the parts may require some assembly, these cable assemblies are also moveable, manufactured goods under the UCC. *See Montaup Electric Co. v. Ohio Brass Corp.*, 561 F.Supp. 740, 746 (D.R.I.1983) (electrical brackets used in construction of transmission line were goods under UCC). Even if the modification of the cable assemblies were construed to be the rendition of services, the price for this service would only be about 5.6 percent of the entire contract price.[2] In this case, where the sale of goods makes up more than 90 percent of the contract price, the services involved would be only incidental to the transaction of goods. *See USM Corp. v. Arthur D. Little Systems, Inc.*, 28 Mass. App.Ct. 108, 115 n. 7, 119, 546 N.E.2d 888 (1989), *further review denied*, 406 Mass. 1104, 550 N.E.2d 396 (1990) (UCC applied where goods only 52 percent of contract value). Consequently, this Court concludes that the cable pieces and cable assemblies are goods under the UCC, and further that the predominant thrust of the agreement was the sale of goods and not the rendition of services.

■ The fact that the settlement of a pending lawsuit was partial consideration for the agreement does not alter the analysis concerning the application of the UCC. The plaintiff, ITT, contends that the case of *New England Power Co. v. Riley Stoker Corp.*, 20 Mass.App.Ct. 25, 34–35, 477 N.E.2d 1054, *further review denied*, 395 Mass. 1103, 481 N.E.2d 197 (1985), controls this case. The plaintiff argues that *Riley Stoker* stands for the proposition that settlement agreements, by their nature, are not contracts for the sale of goods, and the UCC cannot apply to settlement agreements as a rule. The plaintiff, however, misreads the holding in *Riley Stoker*.

In *Riley Stoker*, the Massachusetts Appeals Court analyzed a settlement agreement between the vendor and purchaser of several large sophisticated boilers. 20 Mass.App.Ct. at 26, 477 N.E.2d 1054. Fol-

lowing the sale, the boilers suffered serious defects, and, for several years, the parties worked with consultants and engineers to repair the boilers. *Id.* The settlement agreement at issue exclusively involved the rendition of engineering services and repairs to the boilers in exchange for withheld payments. *Id.* at 35, 477 N.E.2d 1054. In light of these facts, the Massachusetts Appeals Court considered whether the agreement involved goods or services and then held that the settlement agreement "was not a contract for the sale of goods." *Id.* The fact that the agreement involved the settlement of a lawsuit was not the determinative factor in deciding whether the contract involved goods or services.

C. Formation and Interpretation of the Agreement

■ The May 6, 1987 letter from W.P. Sekeres of ITT to Richard Boltrus of LTX constitutes a binding contract between the parties. The letter is a written contract for the sale of goods "sufficient to show agreement." *See* Mass.Gen.L. ch. 106, § 2–204. The letter identifies the Gore cable pieces and TS 88 cable assemblies to be transferred. The letter includes the price and quantity for all the goods as well as terms and conditions for delivery and payment. Finally, the letter is signed by both parties evidencing their agreement to its terms.

The agreement, as drafted, comprises essentially two components. First, ITT Cannon was to sell LTX its remaining inventory of raw Gore electrical cable. Second, ITT Cannon was to modify its remaining inventory of TS 88 cable assemblies to conform to certain specifications not yet decided by the parties. The parties have fully satisfied and do not dispute the first component of the agreement.

■ The dispute in this case centers on the modification of the TS 88 cable assemblies. The parties agree, and this Court has found, that the cable assemblies mod-

---

**2.** The March 6, 1987 agreement states that "[p]rices used in [the agreement] include $124 each for Cannon incurred costs to modify existing cable assemblies...." Also, the agreement includes $18,100 in retooling costs to be paid by LTX. Together, the modifications and retooling costs amount to $77,496 of a stated total contract price of $1,368,118, or about 5.6 percent.

ified by ITT Cannon met the specifications known by the parties as Revision A. The parties also agree, and this Court has found, that the cable assemblies modified to Revision A specifications were commercially unusable by LTX for its testing equipment. The remaining question is whether the agreement requires the defendant, LTX, to accept the commercially unusable cable assemblies as modified by the plaintiff ITT Cannon. For all the reasons stated below, this Court finds for the defendant LTX on this question.

### 1. Acceptance Test Criterion Three

The agreement, on its face, requires that all the cable assemblies shall conform to three acceptance test criteria. The parties agree that the modified cable assemblies satisfied the first two criteria, but the parties disagree as to meaning of the third test criterion and whether the cable assemblies conformed to the criterion. Test criterion three states:

> 100% of cable assemblies will be tested for continuity while subject to flexing stress. The cable is exercised in a circular pattern while observing 156 indicator lights on a special test fixture. This test insures that no wires are broken and that there are no intermittent conditions.

■ Under Massachusetts law, "[w]hen the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." *Robert Industries, Inc. v. Spence*, 362 Mass. 751, 753–54, 291 N.E.2d 407 (1973) (citations omitted). *See Sunbury Textile Mills, Inc. v. Commissioner of Internal Revenue*, 585 F.2d 1190, 1196 (3d Cir.1978) (quoting *Robert Industries*, 362 Mass. at 753–54, 291 N.E.2d 407); *Keating v. Stadium Management Corp.*, 24 Mass.App.Ct. 246, 249–50, 508 N.E.2d 121 (1987) (same). Stated in another way, "[e]xtrinsic evidence bearing on the background and purpose of the parties, as well as their understanding of the meaning of particular language used in the contract,

may be considered both in the construction of ambiguous contract language and in resolving uncertainties in applying the terms of the written contract to the subject matter." *USM Corp.*, 28 Mass.App.Ct. at 116, 546 N.E.2d 888 (citing *Robert Industries*, 362 Mass. at 753, 291 N.E.2d 407).

This basic principle of interpretation applies to contracts involving the sale of goods, and is echoed in the parole evidence rule of the UCC. *See Sunbury Textile Mills*, 585 F.2d at 1195–96 (court quoted and applied rule of *Robert Industries* before considering UCC parole evidence rule); *USM Corp.*, 28 Mass.App.Ct. at 116, 546 N.E.2d 888 (court applied this principle to contract covered by UCC). The parole evidence rule as stated in the UCC is as follows:

> Terms ... set forth in a writing intended by the parties as a final expression of their agreement ... may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement, but may be explained or supplemented (a) by course of dealing ... and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the agreement.

Mass.Gen.L. ch. 106, § 2–202. In light of this applicable law, this Court shall consider the circumstances and background between the parties, their course of dealing, and other submitted evidence to the extent that such evidence explains and supplements the terms of test criterion three.

Turning to the plain language of the agreement, test criterion three states that "the cables will be tested for continuity while subject to flexing stress." Further, the test criterion three requires that the cable assemblies to be "exercised in a circular pattern while observing 156 indicator lights on a special test fixture." Test criterion three further states that the purpose of the testing is to insure that there are no broken wires and no "intermittent conditions."

The agreement does not define the terms of test criterion three further. The agree-

ment does not describe how much or what kind of flexing stress the cable assemblies should sustain to satisfy the test. Further, the agreement does not discuss what the "special test fixture" would be. Given the incompleteness of test criterion three, the Court turns to background circumstances and course of dealing between the parties to help interpret this language.

The parties agreed to the language in test criterion three after several months of discussion and negotiation. On December 11, 1986, the parties met to discuss the problems with breakage in past cable assemblies and the parties discussed possible solutions to the problem. At that time, LTX representatives made it clear that the cable assemblies were failing due to the stress of flexing in use. To help illustrate this problem, LTX representatives took ITT representatives to visit an installation of the cable assembly and to demonstrate the common use of the cable assemblies in their product. At this meeting, the parties had specific discussions concerning the cable assembly design to improve its ability to flex under stress. After the meeting, ITT Cannon produced drawings of the suggestions to improve the cable assembly design. Representatives of ITT Cannon and LTX exchanged correspondence and had discussions concerning the new cable assembly and its ability to flex adequately. Finally, on May 6, 1987, the parties agreed to the language of test criterion three.

As of May 6, 1987, however, the two parties had not selected the exact method for testing under criterion three. ITT Cannon understood that test criterion three referred to a flex testing procedure which it already operated and which ITT Cannon demonstrated by videotape at trial. There was no credible evidence, however, that representatives of LTX knew of ITT Cannon's procedure at the time of the agreement nor that LTX had agreed on using any particular test procedure developed by ITT Cannon. In fact, there was credible evidence to the contrary.

At the time of the agreement, LTX understood that it would have an opportunity to test and, if not satisfactory, modify the new cable assemblies. As stipulated prior to trial, both parties understood and agreed that LTX would have an opportunity to test the new cable assemblies. Further, the language of the agreement specifically contemplates that LTX may modify the cable assemblies after testing. In fact, LTX built its own special flex tester and ITT submitted sample cable assemblies to LTX for testing on such a machine. Thus, the parties clearly did not agree or select a specific method of testing under test criterion three.

In this context, test criterion three must be read in light of the previous dealing and negotiations between the parties. The parties had twice previously contracted for cable assemblies, and both times the assemblies did not work satisfactorily. In both previous contracts, the language of test criterion three was not included. Under a reasonable interpretation of the agreement, test criterion three was included to insure that the cables performed under the flexing stress which both parties knew was the problem from past cable designs. Further, test criterion three must reasonably be read to require that the cable assemblies should undergo the flexing stress for which both parties knew the cables would be used. This interpretation is consistent with the language of test criterion three and does not contradict the written terms of the agreement.

Consequently, since ITT has admitted, and this Court has found, that the cable assemblies were unusable in the commercial context for which both parties knew they would be used, this Court concludes that the modified cable assemblies did not conform to test criterion three and LTX was justified in refusing to accept further delivery of the modified cable assemblies.

2. Implies Warranties under UCC

Under the UCC, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Mass.Gen.L. ch. 106, § 2–314(1). "Goods to be merchantable must at least be such as ... are fit for the ordinary purposes for which such goods are

used...." Mass.Gen.L. ch. 106, § 2–314(2). Further, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose." Mass.Gen.L. ch. 106, § 2–315.

These warranties of merchantability and fitness for a particular purpose may be excluded or modified in certain circumstances. See Mass.Gen.L. ch. 106, § 2–316. "[T]o exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous." Mass. Gen.L. ch. 106, § 2–316(2). "A term ... is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Mass. Gen.L. ch. 106, § 1–201(10). For example, "[a] printed heading in capitals ... is conspicuous", and "[l]anguage in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color." Id.

[7] In this case, ITT Cannon breached the implied warranty of merchantability regarding the TS 88 cable assemblies. ITT Cannon clearly had a history of regularly dealing in electrical cable, cable connectors, and cable assemblies with LTX, and consequently was a merchant in such products as defined by the UCC. See Mass.Gen.L. ch. 106, § 2–104(1); Ferragamo v. Massachusetts Bay Transportation Authority, 395 Mass. 581, 585–91, 481 N.E.2d 477 (1985). Furthermore, as the parties agreed and this Court has found, the TS 88 cable assemblies were commercially unusable for LTX's testing equipment and therefore not fit for the ordinary purpose for which such cables are used. Thus, unless excluded or modified, the TS 88 cable assemblies failed

to satisfy the implied warranty of merchantability found in the agreement.

■ ITT Cannon also breached its implied warranty of fitness for a particular purpose. Representatives of ITT Cannon visited a commercial site with representatives from LTX to see how the cable assemblies were being used in the field. Afterwards, ITT Cannon representatives made drawings of suggestions given by LTX for improvements in the cable assembly design. In this context, ITT Cannon clearly had reason to know the particular purpose for the goods, and furthermore LTX was relying on ITT Cannon's expertise to draw specifications and to modify the cable assemblies for such use.[3] Thus, unless excluded or modified, the TS 88 cable assemblies also failed to satisfy the implied warranty of fitness for a particular purpose.

■ Further, there is no conspicuous language in the agreement which excludes or modifies the implied warranties. The only language which suggests a disclaimer is as follows: "All cable assemblies modified to LTX's 'Rev. A' requirements, to Wire Tech design or to other LTX requirements shall be subject to the standard Cannon terms and conditions of sale." This language is not printed in bold type or capitalized or otherwise displayed in a conspicuous manner. See Mass.Gen.L. ch. 106, § 1–201(10). The terms and conditions of sale were not attached to the May 6, 1987 agreement, and ITT Cannon had only provided the terms and conditions as part of prior transactions and negotiations between the parties.

Under Massachusetts law, the language in the May 6, 1987 agreement is not sufficient to disclaim the implied warranties of the UCC. Hunt v. Perkins Machinery Co., Inc., 352 Mass. 535, 540–41, 226 N.E.2d 228 (1967). In Hunt, the Massachusetts Supreme Judicial Court held that language on a purchase order "subject to terms and conditions stated in this [purchase] order" was not sufficient to disclaim the implied warranties of the UCC even

---

**3.** As the parties agreed and the Court found, LTX has historically looked to other manufacturers, including ITT Cannon, to design and make the cable assemblies. See paragraph 6 supra.

though the language was in bold type, on the front of the order, and the terms and conditions were written on the back of the purchase order. In light of this decision, the language "subject to the standard Cannon terms and conditions of sale" in the May 6, 1987 agreement, which was not in bold type nor capitalized and where the terms and conditions of sale were not even included or attached to the agreement, is not sufficient to disclaim the implied warranties under the UCC.

■ Also, in this case, LTX did not give precise and complete specifications for the cable assemblies such that the implied warranties would not apply. Under Massachusetts law, "[w]hen goods are provided according to plans and specifications furnished by the buyer, the seller does not impliedly warrant their fitness for a particular purpose, and no implied warranty of merchantability arises." *Cumberland Farms*, 25 Mass.App.Ct. at 535, 520 N.E.2d 1321. *See Rust Engineering Co. v. Lawrence Pumps, Inc.*, 401 F.Supp. 328, 332–333 (D.Mass.1975); Mass.Gen.L. ch. 106, § 2–316 Comment 9 ("The situation in which the buyer gives precise and complete specifications to the seller ... is a frequent circumstance by which the implied warranties may be excluded."). But, in this case, the seller ITT Cannon was shown the intended use for the TS 88 cable assemblies. Further, LTX requested and received, albeit reluctantly, ITT Cannon's assistance in designing the Revision A cable assemblies. In fact, it was ITT Cannon who drew up the specifications for the Revisions A cable assemblies based on suggestions by LTX. ITT Cannon was given discretion in drawing up the final design, and ITT Cannon had prior expertise in designing the cable assemblies. ITT Cannon had historically used its expertise in selecting the type of backshell, strain relief, and other features of prior TS 88 cable assembly designs. In light of all these facts, this Court concludes that LTX did not give ITT Cannon "precise and complete specifications" which would exclude the implied warranties of the UCC. Mass.Gen.L. ch. 106, § 2–316 Comment 9.

### 3. Agreement to Produce Commercially Usable Goods

Finally, this Court notes that, even without applying the UCC, ITT Cannon's proposed interpretation of the contract is unfounded under Massachusetts contract law. ITT Cannon argues that under Massachusetts law the agreement imposed no obligation whatsoever to produce commercially usable cable assemblies. ITT Cannon insists that the agreement only required that the cable assemblies conform to three "acceptance test criteria," and that the cable assemblies satisfied these three tests. This proposed interpretation of the contract, however, is insupportable.

■ Under Massachusetts law, the proper interpretation of a contract "is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It [interprets the Agreement] as a business transaction entered into by practical men to accomplish an honest and straightforward end.... [It recognizes that] [e]very contract implies good faith and fair dealing between the parties to it." *Keating*, 24 Mass.App.Ct. at 252, 508 N.E.2d 121 (citations omitted) (quoting *Clark v. State St. Trust Co.*, 270 Mass. 140, 153, 169 N.E. 897 (1930)). *See Shane v. Winter Hill Fed. Sav. & Loan Assn.*, 397 Mass. 479, 483, 492 N.E.2d 92 (1986); *Shapiro v. Grinspoon*, 27 Mass. App.Ct. 596, 600–01, 541 N.E.2d 359 (1989).

■ In this case, the agreement on its face calls for ITT Cannon to modify existing cable assemblies to certain specifications to be selected by LTX in the future. The agreement was reached out of a desire to correct problems with previous cable assembly designs which had failed. The parties met and discussed the cable assembly failures extensively, and the parties reached this agreement with the intent of correcting the problems. The parties to this transaction are business people who presumably desire to make and use a commercial product. In this commercial context, it would belie common sense and sound rules of contract construction to suggest that the parties intended that the Revision A cable assemblies would not be a

commercially usable product. Therefore, since the parties have agreed and the Court has found that the modified Revision A cable assemblies are commercially unusable, LTX did not breach the agreement between the parties.

For all the reasons stated above, this Court finds that ITT's claim for breach of contract should be denied, and judgment should be entered for LTX. Order accordingly.