NEW ENGLAND POWER COMPANY & another[1] *vs.* RILEY
STOKER CORPORATION.

Essex.    November 15, 1984. — May 14, 1985.

Present: PERRETTA, DREBEN, & KASS, JJ.

*Warranty. Limitations, Statute of. Contract,* Performance and breach. *Sale,*
Contract of sale, Delivery of goods. *Estoppel. Negligence,* Economic
loss.

A cause of action by the purchasers of industrial boilers against the man-
ufacturer, alleging breach of warranty, accrued no later than the respec-
tive times at which the boilers were put into commercial use, and the
circumstance that the parties knew the boilers to be defective when
delivered did not prevent the occurrence of such "tender of delivery"
under G. L. c. 106, § 2-725 (2), as would start the running of the
applicable limitations period. [27-29]
There was no merit to a contention of the purchasers of industrial boilers,
in an action against the manufacturer, that certain language in their sales
contracts constituted a promise to repair, rather than a warranty, and
that therefore their cause of action did not accrue until the manufacturer
either refused or failed to repair the boilers. [29-31]
A manufacturer's repeated efforts to repair two industrial boilers did not
have the effect of tolling the statute of limitations applicable under G. L.
c. 106, § 2-725 (1), to an action by the purchasers of the boilers against
the manufacturer. [31-32]
In view of the sophistication of the parties and the commercial context in
which their dealings had occurred, there was nothing in the conduct of
the manufacturer of two industrial boilers, in attempting repair of the
boilers, which would estop it from asserting that an action against it by
the purchasers was barred by the statute of limitations. [32-34]
An agreement, described as a "Settlement Agreement," between the man-
ufacturer and the purchasers of industrial boilers gave rise to no implied
warranty and superseded any express warranties based on oral statements
of the manufacturer. [34-35]
There was no merit to a contention by the purchasers of two industrial
boilers that the manufacturer had consented to be sued on a claim for

---

[1] New England Power Service Company, which provides engineering and
other services to New England Power Company.

economic loss resulting from negligence in the performance of its contracts with the purchasers. [35]

CIVIL ACTION commenced in the Superior Court Department on March 11, 1980.

The case was heard by *Thomas R. Morse, Jr.*, J., on a motion for summary judgment.

*Arnold P. Messing (Leonard M. Singer, Mark S. Swartz & John F. Sherman, III,* with him) for the plaintiffs.

*Thomas R. Murtagh (Kenneth J. Gumbiner* with him) for the defendant.

PERRETTA, J. In 1969, the plaintiffs (referred to herein, in the singular, as NEP) entered into two contracts with the defendant (Riley) for the design, manufacture, and installation of two boilers for NEP's facilities at Salem and Brayton Point (Fall River). A detailed description of the boilers is unnecessary. It is sufficient to state, as did NEP in its amended complaint,[2] that "[b]oilers such as these are technologically complex and sophisticated and . . . are entirely dissimilar from the small, residential or commercial units with which the public is generally familiar." Almost as soon as the boilers were put into use, it became apparent that they suffered from serious defects. Then began an extended period, from 1972 through 1976, during which Riley, working along with independent consultants and engineers retained by NEP, made repeated but unsuccessful attempts to repair the boilers. By 1978, Riley was no longer participating in any repair attempts. On March 11, 1980, NEP brought this action, alleging breaches of warranties and of promises to repair, as well as negligence. Riley affirmatively pleaded that the action was time-barred under G. L. c. 106, § 2-725(1), and c. 260, § 2A, and moved for summary judgment. NEP appeals from the judgment entered on Riley's motion and argues that its action was not commenced beyond the time allowed by those statutes and, in the alternative, that Riley is estopped by its conduct from asserting that defense. We affirm.

--------

[2] NEP's original complaint was dismissed, with leave to amend, for substantially the same reasons summary judgment entered on its amended complaint.

I. BREACHES OF WARRANTIES.[3]

If NEP were to commence timely its action for breaches of warranties under the contract, it was required by G. L. c. 106, § 2-725(1), as appearing in St. 1957, c. 765, § 1, to bring its action "within four years after the cause of action has accrued." Paragraph (2) of § 2-725 provides, in full:

"A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."[4]

When Riley tendered delivery of the boilers is the issue in dispute. By way of definition, G. L. c. 106, § 2-503(1), as appearing in St. 1957, c. 765, § 1, provides that tender of delivery "requires that the seller put and hold conforming goods

---

[3] Counts one and seven of the amended complaint allege breaches of express and implied warranties under the two contracts of sale, count one as to Salem, count seven as to Brayton Point. The arguments in NEP's brief are diffuse and scattered, but, as we understand them, NEP now argues only as to implied warranties. Its claims based on breaches of express warranties under those contracts have been transformed, as will be seen *infra*, to claims of breaches of promises to repair, as alleged in counts two and eight. To the extent we have misconstrued NEP's contentions, it may not complain. See Mass.R.A.P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[4] We are not dealing with warranties as to future performance. (See e.g., *Mittasch* v. *Seal Lock Burial Vault, Inc.*, 42 A.D.2d 573 [N.Y. 1973], where the court held that the statement that the casket and burial vault "will give satisfactory service at all times" was a warranty which explicitly extended to future performance.) Were we, NEP would have no claim, since it does not argue express warranties, and "an implied warranty, by its very nature, cannot explicitly extend to future performance." *Holdridge* v. *Heyer-Schulte Corp.*, 440 F. Supp. 1088, 1104 (N.D. N.Y. 1977). See also *Sponseller* v. *Meltebeke*, 280 Or. 361, 365 n.2 (1977); *South Burlington Sch. Dist.* v. *Calcagni-Frazier-Zajchowski Architects, Inc.*, 138 Vt. 33, 48 (1980).

at the buyer's disposition . . . ." The judge found that the Salem and Brayton Point boilers were put into "commercial use" on August 24, 1972, and December 18, 1974, respectively, and concluded that delivery had to have been completed prior to March, 1976.[5] Suit was commenced on March 11, 1980.

NEP argues that there was no tender of delivery prior to March of 1976 and that, in fact, delivery has never been tendered. As support for this contention, NEP extracts two sentences from the first paragraph of the official comment to G. L. c. 106, § 2-503: "The term 'tender' is used in this Article in two different senses. In one sense it refers to 'due tender' which contemplates an offer coupled with a present ability to fulfil all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed."[6] Comment 1 to § 2-503 of the Uniform Commercial Code, 1A U.L.A. (Master ed. 1976). Defining tender as "due tender," NEP argues that there was no tender of delivery within the meaning of § 2-725(2), because when the boilers were "delivered," both Riley and NEP knew that they were defective and had to be repaired. Extending this theory, NEP takes the position that since the boilers are still defective, there has been no tender of delivery.

A similar, if not identical, argument was unsuccessfully made is *Standard Alliance Indus.* v. *Black Clawson Co.*, 587

---

[5] In its brief, NEP states that in the utility industry the term "commercial use" means that the boiler is generating steam and that the term is "strictly a financial and rate-making consideration unrelated to compliance or non-compliance with the contract." This contention would be material and in dispute only if we accept NEP's definition of "tender of delivery," which, as will be seen, *infra*, we do not.

[6] That paragraph continues: "Unless the context unmistakably indicates otherwise this is the meaning of 'tender' in this Article and the occasional addition of the word 'due' is only for clarity and emphasis. At other times it is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation. *Used in either sense, however, 'tender' connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner.*" (Emphasis added.)

F.2d 813, 819 (6th Cir. 1978),[7] i.e., that "tender" of new, highly complex machinery should not be held to have occurred until the machine is made to operate properly. We also do not accept this claim, for to do so would "extend the statute of limitations indefinitely into the future since a defect at the time of delivery would prevent proper 'due tender' from taking place until it was corrected." *Id.* See also *Ontario Hydro* v. *Zallea Syss., Inc.*, 569 F. Supp. 1261, 1267 (D. Del. 1983) ("If the court were to apply the phrase ['due tender'] as [the plaintiff] suggests, then until the seller tenders conforming goods, the limitation period provided in § 2-725 would never apply. This would circumvent the very purpose of § 2-725, which . . . is to provide a finite period in time when the seller knows that he is relieved from liability for a possible breach of contract for sale or breach of warranty"). We conclude that the definition of tender of delivery urged by NEP is inconsistent with the purpose of § 2-725(2), as well as with the final sentence of the first paragraph of the official code comment to § 2-503. See note 6, *supra.*

We are not dissuaded from our conclusion by NEP's argument that acceptance of "due tender" as the controlling definition is compelling where the seller and buyer acknowledge at the time of delivery that the goods are defective. We see no reason to apply a more rigorous rule to an unwitting buyer than to a fully informed one. Simply put, although knowledge may be relevant to a buyer's acceptance of goods, see G. L. c. 106, § 2-607, it is irrelevant to the running of the time period set out in § 2-725, except where, unlike here, there is a warranty as to future performance. See *Raymond-Dravo-Langenfelder* v. *Microdot, Inc.*, 425 F. Supp. 614, 617 (D. Del. 1977).[8]

---

[7] Cases from jurisdictions other than Massachusetts deal with the relevant parts of § 2-725 of the Uniform Commercial Code which are in a form identical to those found in G. L. c. 106.

[8] Because of our conclusion, we need not consider Riley's claim, made in support of the judgment, that all implied warranties had been excluded under the contract. See G. L. c. 106, § 2-316(2).

II. Promises to Repair.[9]

Both contracts entered into in 1969 contain the following clause:

> "Notwithstanding the other continuing obligations of the Contractor under this Agreement, the Contractor shall repair and make good, without cost to the Purchaser, any damages, defects or faults resulting from imperfect or defective work done or unsound or improper materials furnished by the Contractor which develop during the period of one year (or during a longer period if so stipulated in the specifications) from date of the certification by the Engineer that the work has been completed."

NEP argues that language constitutes "a promise rather than a warranty," and that this cause of action could not have accrued until Riley, in 1978, refused or failed to repair the boilers. However, promises to repair or to replace are generally viewed as specifications of a remedy rather than as an independent or separate warranty. See *Standard Alliance Indus.* v. *Black Clawson Co.*, 587 F.2d at 818 n.10; *Ontario Hydro* v. *Zallea Syss., Inc.*, 569 F. Supp. at 1266-1267; *Centennial Ins. Co.* v. *General Elec. Co.*, 74 Mich. App. 169, 171-172 (1977); *Commissioners of Fire Dist. No. 9* v. *American La France*, 176 N.J. Super. 566, 573 (1980); *Owens* v. *Patent Scaffolding Co.*, 77 Misc.2d 992, 998-999 (Sup. Ct. 1974), rev'd on other grounds, 50 A.D. 2d 866 (N.Y. 1975). Those cases instruct that when there are a warranty and a promise to repair, the remedy of first resort is the promise to repair. If that promise is not fulfilled, then the cause of action is the underlying breach of warranty.

The reasoning is sound and particularly pertinent here, where NEP's argument seems structured to avoid the consequences of its failure timely to commence suit. As pointed out in *Centennial Ins. Co.* v. *General Elec. Co.*, 77 Mich. App. at 172:

---

[9] Counts two and eight of the amended complaint speak in terms of breaches of express warranties. NEP now couches its claims in terms of promises distinct from warranties.

"Plaintiff's argument is in essence that by failing to remedy its first breach, the defendant committed a second breach, giving rise to a brand new cause of action and starting anew the limitations period. The fallacy of this approach is apparent. If we adopted plaintiff's position, limitations periods could be extended for virtually infinite time. We doubt that the Legislature intended such a result."[10] It follows from this that what we have stated in part I of this opinion is applicable to NEP's claims of breaches of the promises to repair.

III. TOLLING AND ESTOPPEL.

NEP next contends that Riley's repeated efforts to repair and assurances that the boilers would be fixed either tolled the running of § 2-725(1) or estopped Riley from relying upon it as a defense.

a. *Tolling.* Whether repeated repair efforts toll the running of § 2-725(1) depends upon our tolling statutes, as found in G. L. c. 260, §§ 7 through 12, since § 2-725 "does not alter the law on tolling of the statute of limitations . . . ." G. L. c. 106, § 2-725(4), as appearing in St. 1957, c. 765, § 1. See *Bedford* v. *James Leffel & Co.*, 558 F.2d 216, 217 (4th Cir. 1977). There is nothing in our tolling statutes which would allow NEP to commence suit as late as sometime in 1982, in other words, four years after Riley ceased its efforts to repair the boilers. Nor is it open to us to enlarge upon those statutes.[11] See *Del Grosso* v. *Board of Appeal of Revere,*

---

[10] NEP cites three cases as direct authority for its claim. However, in one, *Space Leasing Associates* v. *Atlantic Bldg. Syss., Inc.*, 144 Ga. App. 320 (1977), the clause in question, at 321, was a replacement warranty given in lieu of all other warranties, expressed or implied, including an implied warranty of merchantability." In *Shapiro* v. *Long Island Lighting Co.*, 71 A.D.2d 671 (N.Y. 1979), the court held that the contract was a replacement warranty rather than a warranty as to future performance and, as such, was time-barred under § 2-725. As *Rochester Welding Supply Corp.* v. *Burroughs Corp.*, 78 A.D.2d 983 (N.Y. 1980), concerns a warranty as to future performance, it too is inapplicable.

[11] NEP relies upon *Colorado-Ute Elec. Assn.* v. *Envirotech Corp.*, 524 F.Supp. 1152, 1155-1156 (D. Col. 1981), for the proposition that repair efforts generally toll § 2-725(1). However, there the court cited and relied upon *Kniffin* v. *Colorado Western Dev. Co.*, 622 P.2d 586 (Colo. Ct. App.

330 Mass. 29, 32 (1953), and cases therein cited.

b. *Estoppel.* If NEP is to escape the consequence of its lack of diligence in bringing its action, it must be by way of proof that Riley wrongfully lulled NEP into the delay. See *White* v. *Peabody Constr. Co.*, 386 Mass. 121, 134 (1982) ("[E]stoppel would require proof that the defendants made representations they knew or should have known would induce the plaintiffs to put off bringing a suit and that the plaintiffs did in fact delay in reliance on the representations"). The judge concluded that the facts alleged by NEP to estop Riley, even if proved, were insufficient as matter of law because: (1) NEP made no allegation of fraud or misrepresentations by Riley which would show that Riley "purposely prolonged the time for repairs beyond the running of the statute of limitations"; (2) any assurance given by Riley that the boilers would be fixed did not rise to the level of "lulling" NEP into "foregoing suit"; and (3) "both parties are large corporations with equal access to legal advice."

There are no rigid criteria to apply in determining whether a defendant's conduct was such as to give rise to an estoppel. The test, if it can be so called, is that the "doctrine of estoppel is not applied except when to refuse it would be inequitable." *Boston & A. R.R.* v. *Reardon*, 226 Mass. 286, 291 (1917). See also *McLearn* v. *Hill*, 276 Mass. 519, 524 (1931). We think it appropriate then, when looking to the facts offered by NEP to show an estoppel, that they be viewed in the context in which they took place, i.e., "Here . . . we have two corporate behemoths, well able to look out for themselves . . . ." *Standard Alliance Indus.* v. *Black Clawson Co.*, 587 F.2d at 882.

NEP contends that whether it was lulled into inaction by Riley presents a material factual dispute. The conduct NEP relies upon is correspondence between NEP and Riley in 1974. NEP wrote to Riley suggesting that arbitration would be a reasonable course of action "at this time." NEP's letter pointed

---

1980), as indicative of Colorado's acceptance of the theory that repair efforts operate to toll the running of a limitation period. Compare *Triangle Underwriters, Inc.* v. *Honeywell, Inc.*, 457 F. Supp. 765, 768, 771 (E.D. N.Y. 1978).

out: "While arbitration is not the nicest place to end up, it seems preferable to an open break between our companies, and the unpleasant events that will inevitably follow . . . ." Riley responded, and swiftly, that Riley and NEP were more competent than an arbitrator to analyze the problems with the boilers. Riley added that it "has in the past and will in the future stand behind all of its warranties" and that "[s]hould there be design deficiencies, Riley . . . corrects them without further cost to the customer." Riley pointed out that there were "major questions" as to whether problems with the boilers were in fact caused by improper operation rather than any design deficiencies. The letter concluded with Riley voicing "concerns" of its own regarding NEP's failure to release certain monies owed to Riley.

Reading this correspondence as favorably as possible to NEP, we do not see how, in the absence of distortion, Riley's statements could give rise to an estoppel.[12] See *Ford* v. *Rogovin*, 289 Mass. 549, 552-553 (1935). Compare *Bergeron* v. *Mansour*, 152 F.2d 27, 29 (1st Cir. 1945); *McLearn* v. *Hill*, 276 Mass. at 521-524; *LaBonte* v. *New York, N.H. & H. R.R.*, 341 Mass. 127, 129 (1960). When we couple these statements with Riley's repeated efforts to repair (1972 through 1976, when the efforts tapered off; they ceased altogether by 1978), NEP's argument loses rather than gains force. Compare *LaBonte* v. *New York, N.H. & H. R.R.*, 341 Mass. at 131. The undisputed facts show that it was Riley's position from the outset that it would repair the boilers and that it continuously

---

[12] NEP also relies upon oral statements alleged by NEP's general purchasing agent by way of affidavit to have been made by Riley in response to the purchasing agent's complaints that if the boilers were not fixed, litigation would be commenced. The purchasing agent set out Riley's response as, "Riley repeatedly assured me that it would repair the boilers and that litigation was not necessary." It does not appear from the judge's memorandum of decision that he took these statements into account. He was, however, free to disregard them. Conspicuously missing from the affidavit are any factors to show who from Riley gave these assurances. See *Stetson* v. *Selectmen of Carlisle*, 369 Mass. 755, 763 n.12 (1976); *Royal Bank of Canada* v. *Connolly*, 9 Mass. App. Ct. 905 (1980).

tried to do so. NEP does not allege that Riley's repair efforts were insincere or a mere pretext, only that they were unsuccessful.

That NEP may have behaved in a commercially reasonable manner in relying upon Riley's efforts (in the belief that because Riley designed, manufactured, and installed the boilers, it was best able to repair them) does not become material until it is first shown that Riley engaged in some conduct, such as insincere effort, which would make it unfair to allow Riley to rely upon § 2-725(1). We do not view the fact of honest, genuine repair efforts, standing alone, as sufficient basis for application of the doctrine of estoppel. In our view, to conclude otherwise would be to hold that repair efforts toll § 2-725.

IV. SUBSEQUENT AGREEMENT.

Because Riley's efforts to repair the Salem boiler were not meeting with success, NEP began to withhold payments due under that contract. Riley, in September of 1973, informed NEP that many of the problems with the boiler were caused by NEP's improper operation of the equipment, and Riley demanded payment. NEP refused the request for payment as well as Riley's second demand in February, 1974.

On February 5, 1974, Riley and NEP's engineers and consultants met to discuss possible repairs and use of a "stringer support system." Riley disputed that such a system was necessary and suggested, instead, installation of "sinuous bracelets." Those disputes, repairs, and payments, continued until July 9, 1974, when the parties entered into an agreement, which was amended in October of that year. Counts three and four of NEP's amended complaint allege breaches of express and implied warranties under the 1974 agreement, as amended.

As we read that agreement, however, it is not a contract for the sale of goods, see G. L. c. 106, § 2-106(1), nor does it modify the original contract, see G. L. c. 106, § 2-209, thereby bringing it under the umbrella of any warranties therein given. Cf. *Skinner* v. *Tober Foreign Motors, Inc.*, 345 Mass. 429, 433 (1963).

The 1974 document is labelled a "Settlement Agreement," not a modification agreement as NEP characterizes it. The October amendment specifically refers to amendment of the

July "Settlement Agreement." The preamble to the substantive clauses of the July agreement recites that "disputes have arisen between NEPCO and Riley relating to the contract" between them for the Salem boiler and that "the parties hereto are desirous of compromising and settling said dispute." In exchange for NEP's release of the withheld payments to Riley, Riley agreed to "fabricate, free of charge," the stringer support system. If that system were to exhibit any defects within one year following "start-up after installation," then Riley "will provide free of charge engineering services as necessary to correct said defects." NEP makes no argument that Riley failed to provide any necessary engineering services under this agreement. As we construe the 1974 agreement, as amended, it was not a contract for the sale of goods, and it did not give rise to any implied warranties. See *Stafford* v. *International Harvester Co.*, 668 F.2d 142, 147 (2d Cir. 1981); *Consolidated Edision Co.* v. *Westinghouse Elec. Corp.*, 567 F. Supp. 358, 362 (S.D. N.Y. 1983).

As all of NEP's claims relating to express warranties are based upon oral statements made prior to the agreement and its amendment, they are, even if proved, unenforceable as matter of law as they were "superseded by the unambiguous provisions of the integrated written agreement." *Buker* v. *National Management Corp.*, 16 Mass. App. Ct. 36, 42 (1983).

V. NEGLIGENCE.

The remaining counts of NEP's amended complaint allege that Riley performed various obligations under the contracts and 1974 agreement negligently. Even assuming (but specifically not concluding) that these claims are not precluded under G. L. c. 260, § 2A, these claims seek relief for economic loss and damage to the boilers, injuries for which there is no recovery. See *Marcil* v. *John Deere Industrial Equip. Co.*, 9 Mass. App. Ct. 625, 629-632 (1980), and cases cited. There is no merit to NEP's contention that because Riley limited its liability in negligence, see G. L. c. 106, § 2-719(1), to the "cost of repair or replacement of defective parts on a straight time basis," Riley, in effect, consented to be sued for a cause of action not recognized in Massachusetts.

*Judgment affirmed.*