LEONARD S. LIBMAN[1] *vs.* MORTIMER ZUCKERMAN &
others.[2]

No. 91-P-203.

Middlesex. June 11, 1992. - September 28, 1992.

Present: KASS, PORADA, & LAURENCE, JJ.

*Practice, Civil,* Master: findings; report. *Limitations, Statute of. Condo-
miniums,* Management. *Estoppel. Negligence,* Construction work, De-
sign. *Damages,* Defective construction.

The three-year limitation period provided in G. L. c. 260, § 2B did not bar
a claim by members of a condominium association against the develop-
ers of the condominium, alleging negligence in design and construction
due to defective installation of siding on the units, even though failure
of the siding was first noticed late in 1978 and the complaint was not
filed until June 30, 1982, where the defendants' failure to file any ob-
jections to a master's findings of fact warranting an ultimate finding of
estoppel as to the defendants' statute of limitations defense (i.e., the
plaintiffs had delayed legal action in reliance upon repeated assurances
by the defendants that the defects in the siding would be corrected)
precluded challenge on appeal. [344-347]
On a claim by members of a condominium association against the develop-
ers of the condominium, alleging negligence in design and construction
due to defective installation of siding on the units, there was support in
the record for a master's finding that total replacement of the siding, at
approximately $6,800 per unit, was required. [347-348]

---

[1]In his complaint (and two amendments to that complaint), Libman
identifies himself as a member and chairman of the board of managers "of
the plaintiff, Turkey Hill Village Association, an [a]ssociation of seventy-
five (75) condominium unit owners in the village of Turkey Hill." Turkey
Hill Village Association is the unit owners organization formed in
accordance with G. L. c. 183A, §§ 8(*i*) and 10.

[2]Edward H. Linde and Devens Hamlen, who are joint venturers of
Turkey Hill Associates, the developer of the condominium complex in
which the plaintiffs live, as well as trustees of Mainstone Associates Trust,
and Mortimer Zuckerman and Edward H. Linde, as trustees of Boston
Properties.

CIVIL ACTION commenced in the Superior Court Department on June 30, 1982.

After the case was referred to a master by *Guy Volterra, J.,* a motion to adopt the master's report was heard by *James P. Lynch, Jr., J.*

*Jeffrey S. Robbins* (*Peter B. Krupp* with him) for the defendants.

*Joel Lewin* (*Mary P. Murray* with him) for the plaintiffs.

KASS, J. There is more to the art of choosing and installing house siding than the uninitiated might imagine. In this case, the plaintiffs complained that the defendants chose the wrong siding material and installed it badly. Upon the report of a master to whom the task of finding facts had been referred (see Mass.R.Civ.P. 53, as amended, 386 Mass. 1237 [1982]), a judge of the Superior Court entered judgment against the defendants in the amount of $509,914, plus interest in the same amount.[3] The principal defense, although not the only one, is that the plaintiffs' claim is barred by the statute of limitations. We affirm.

Stripped of detail which would not illuminate this opinion, the plaintiffs may be described as the members of the unit owners association of the Turkey Hill Village, a seventy-five-unit condominium in Wayland. Theirs is the first phase of a large development called Mainstone Farm, which contemplates the construction of 435 residences on a 363-acre site. To hold title to that site, the promoters of the project, Mortimer Zuckerman, Devens Hamlen, and Edward H. Linde, formed a nominee trust, Mainstone Associates Trust, of which they are the trustees and the beneficiaries. As the business entity which would do the planning, development (e.g., obtaining required public approvals, making design decisions), and building, the three joint venturers formed Turkey Hill Associates ("THA"). Responsibility as the general con-

---

[3]Interest began running upon the filing of the complaint, June 30, 1982, at the rate of twelve percent per year, and the judgment was dated October 31, 1990, a period of 100 months, therefore, 100%. See G. L. c. 231, § 6B. The docket entry for interest is $509,194, but that does not correspond with the $509,914 figure in the judgment and we assume the docket entry represents a typographical error.

tractor was conferred by THA upon Boston Properties, a Massachusetts business trust, of which Linde and Zuckerman are the trustees and sole shareholders. Linde, Zuckerman, and Hamlen were the original board of managers of the unit owners organization of the condominium. For convenience of reference, we refer to the defendants (as they did in their brief) collectively as Boston Properties.

These facts and those which follow we have culled largely from a conscientious and ably prepared master's report. The order of reference was "facts final," with instruction to the master, however, to file with his report a transcript of the evidence of the proceedings. Contrast *Covich* v. *Chambers*, 8 Mass. App. Ct. 740, 741-742 (1979); *Miller* v. *Winshall*, 9 Mass. App. Ct. 312 (1980), which were also decided on an earlier version of Mass.R.Civ.P. 53. The filing of the transcript permits an appellant to direct a reviewing court (in the first instance, the trial court) to that transcript concerning points of objection. Nevertheless, the findings of the master are to be accepted by the court unless "they are clearly erroneous, mutually inconsistent, unwarranted by the evidence before the master as a matter of law or are otherwise tainted by error of law." Mass.R.Civ.P. 53(h)(1). Availability of the transcript does not alter a principal objective of referring a case to a master, the delegation of the fact-finding function. *Shelburne Shirt Co.* v. *Singer*, 322 Mass. 262, 265 (1948). *Miller* v. *Winshall*, 9 Mass. App. Ct. at 313-314. A master's subsidiary findings are supposed to have heft, and they will not be set aside unless the reviewing court is firmly and definitively convinced that they are mistaken. *Pollock* v. *Marshall*, 391 Mass. 543, 554 (1984).

As originally drawn by the developer's architect, the specification for siding at Turkey Hill Village called for red cedar. Red cedar is a wood of choice for siding because it is a soft wood and its suppleness enables it to expand, contract, and move with weather changes. The superintendent of construction for Boston Properties successfully urged the substitution of luan, a Malayan mahogany, as a siding material, because it was cheaper. Peter A. Fickeisen, the principal of the fram-

ing and siding subcontractor on the job, warned that he had experienced cupping, bowing, splitting, and popping of nails with luan at a job in Lexington.[4] He would not, therefore, guarantee a siding system of luan nailed into styrofoam sheathing, which is what the specifications called for. The orthodox backing for siding is a sheathing (the material nailed to the studs) of plywood and building paper; it has the advantage of holding nails driven to attach the siding even if the nails miss the studs. Styrofoam provides the benefit of added insulation, but does not hold nails.

Luan siding tends to bow, cup and split because of its stiffness, the rate at which it absorbs moisture, and because it shrinks when it dries. In addition to the inherent quirks to which luan was prone, failure of the siding was compounded by a significant amount of multiple nailing, i.e., nailing one clapboard through another, an error which prevents clapboards from moving independently in response to weather change. If the clapboards cannot move independently, they pull at each other and crack. There were additional nailing errors, such as use of improper nails and failure to penetrate the sheathing.

With this background, the reader will not be astonished to learn that the siding at Turkey Hill Village cupped, bowed, cracked, and popped to a fare-thee-well.

1. *Statute of limitations defense.* Failure of the siding was first noticed late in 1978, and the complaint in this action was not filed until June 30, 1982. Insofar as the action speaks of negligence in design and construction, it appears on its face to have been begun beyond the three-year limitation period provided for in G. L. c. 260, § 2B. The master, however, found that the statute did not begin to run when the first defects became apparent because construction was continued well into 1981 and "it was reasonable for plaintiffs to

---

[4]"Cupping" is a curving over the width of the clapboard which occurs when the outer side exposed to the elements dries and shrinks more quickly than the inner side. This causes nails to pull out, or, if the board is nailed very tight, causes the board surface to crack. The cupping phenomenon may also distribute stress to other clapboards, causing them to fail. "Bowing" is a curving of the board along its length.

assume that defects would be corrected." Moreover, Boston Properties had promised repeatedly that it would repair the defective siding, so that the plaintiffs relied on that promise and forwent bringing suit. Consequently, the master concluded, Boston Properties was estopped from raising the statute of limitations based on the 1978 discovery of harm. As an additional support for his estoppel decision, the master pointed to the control by the defendants of the board of managers of the condominium owners' association. The defective siding was common area within the meaning of G. L. c. 183A, § 1,[5] and, as such, decisions relating to the siding, including the commencement of litigation, were within the authority of the board of managers. See G. L. c. 183A, § 5(*e*) and (*f*) and § 10(*b*)(4); *Golub* v. *Milpo, Inc.*, 402 Mass. 397, 401-402 (1988); *Glickman* v. *Brown*, 21 Mass. App. Ct. 229, 237 (1985). For explication of the proposition that the right of action is not exclusive to the unit owners association, see *Cigal* v. *Leader Dev. Corp.*, 408 Mass. 212, 214-217 (1990).

On appeal, Boston Properties vigorously attacks the master's findings of fact warranting an ultimate finding of estoppel as to its statute of limitations defense. Yet when it filed objections to the master's report conformably with Mass.R.Civ.P. 53 (h)(2), those objections (which consumed twenty-nine pages) did not touch on the master's findings concerning the timeliness of the negligence claim. The failure to file any objections to the master's report as to this subject precludes challenge at this later stage of review. *Antioch Temple, Inc.* v. *Parekh*, 383 Mass. 854, 862 (1981).

If we follow the response of Boston Properties to this difficulty, it is that it was not obliged to advert to the estoppel point in its objections to the master's report, because error of law is apparent on the face of the report, i.e., one has but to read the master's findings to know that they will not work an estoppel. The defendants' position is mischievous.

Objections to a master's report are directed to the reviewing trial court so that it may consider grounds for striking,

---

[5]The parties had stipulated to this manifestly correct view of the status, under G. L. c. 183A, of the exterior of the condominium units.

modifying, recommitting, or adopting the master's report. The reviewing judge cannot be expected to wade through the master's report so as to pick up the objecting party's points sua sponte. *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 192 (1976). The general and important principle that the case reviewed on appeal is to be the same one that was tried, and that points not raised in the trial court are, therefore, lost, see, e.g., *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 471. & n. 25 (1991), is equally applicable to proceedings involving a master's report. *Michelson* v. *Aronson*, 4 Mass. App. Ct. at 192-193.

Parenthetically, the case of Boston Properties on the statute of limitations point is no more substantial on the merits. Boston Properties misreads the opinion in *New England Power Co.* v. *Riley Stoker Corp.*, 20 Mass. App. Ct. 25 (1985), in suggesting that case requires, in every instance, a preemptive litigation strike within the limitations period from first discovery of injury. In *New England Power Co.*, we decided that repeated attempts by the manufacturer of two boilers to repair their malfunctioning did not extend the statute of limitations. We added, however, that "[t]here are no rigid criteria to apply in determining whether a defendant's conduct was such as to give rise to an estoppel." *Id.* at 32.

Here, the master had substantial material in the record to support his finding that the plaintiffs had been induced to forbear from bringing suit earlier.[6] On June 15, 1979, Linde, in his capacity as trustee of Mainstone Villages Trust,[7] wrote to the unit owners, "You have our guarantee that the defective areas will be corrected prior to next winter systematically and cluster by cluster." Minutes of meetings of the owners and the board of managers contain statements by Linde that replacement of defective siding is continuing and that the initial one-year warranty will be extended by an-

---

[6]We are not persuaded by the defense argument that the master's finding took on a speculative quality because he wrote "the unit owners apparently believed that promise and forwent filing suit." In context, the use of the adverb "apparently" more reasonably connotes "obviously" than "perhaps."

[7]Linde was also president of Boston Properties.

other year from the time of completion of the corrective work. At a meeting of the board of managers on March 20, 1980, Linde said that the crew doing corrective work would start again with the advent of good weather. On August 19, 1981, the vice-president of construction of Boston Properties wrote to the board of managers that "[w]e had taken a position of refusing to do any further punch list work pertaining to the siding in your Village until we had received assurances that legal action would not be taken against us." Upon those elements in the record, the master was warranted in finding that the plaintiffs had delayed legal action in reliance upon repeated undertakings by the defendants that the defects in the siding would be corrected. See *McLearn* v. *Hill*, 276 Mass. 519, 523-527 (1931) (defendant who induces a plaintiff to discontinue a timely action is estopped from pleading the statute of limitations to a new action); *LaBonte* v. *New York, N.H. & H. R.R.*, 341 Mass. 127, 131 (1960) (defendant's claim agent told the plaintiff he should not have consulted a lawyer, that his claim would be taken care of).

As we have decided that the negligence in design and construction theory of liability is not barred, we need not consider the arguments of Boston Properties pertaining to the express limited warranty given to each unit owner at the time of delivery of the unit deed.

2. *Damages.* Expert witnesses called by the plaintiffs said that after Boston Properties ended (around Thanksgiving, 1981) its considerable efforts to correct the siding in the project, forty-three percent of the siding would still have to be replaced to correct observable defects. The master found that on the evidence it would be neither practical nor economical to replace forty-three percent of the siding. This was so, the master found, because (i) the damaged areas are not localized but are found in many places; (ii) replacing defective siding while leaving siding without defects intact would require almost perfect workmanship; (iii) sections of siding which were systemically weak would begin to come apart as adjoining portions were corrected; and (iv) a piecemeal approach, which had been tried, failed to confront fundamental

flaws in design, materials, and installation. The master found that a repair of approximately $6,800 per unit was required and that such an amount was neither unreasonable nor disproportionate to the value of the condominium units.

There is support in the record for the finding that total replacement of siding was required. Two expert witnesses for the plaintiff, Philip Westover and David L. Adler, consulting engineers with the firm of Simpson, Gumpertz & Heger, Inc., testified that luan would exert force on replacement boards of red cedar, causing them to become distorted, because luan is stiffer, absorbs moisture faster, and shrinks more than red cedar. The same properties of luan would make it tend to pull nails, a prospect all the more certain because of nailing errors, including the use of too short nails and frequent failure to penetrate the sheathing properly, if at all.

These installation errors increased the tendency of the clapboards to transmit stress to other boards and cause distortion. There were errors in the installation of flashing which caused water to accumulate behind siding, rather than drain, adding to distortion of the wood. Both experts expressed their opinions that removing and replacing a damaged clapboard with a different wood placed the neighboring boards at risk for future damage. The experts, therefore, gave their opinions that total replacement was the only sensible approach to correcting the defects in the siding.

Matching that evidence against the master's findings, we do not think that those findings are clearly erroneous. There was no error in the adoption of the master's report and the entry of judgment on the basis of it.

*Judgment affirmed.*