**AKROSIL DIVISION OF INTERNATIONAL PAPER COMPANY, Plaintiff,**

v.

**RITRAMA DURAMARK, INC., Defendant.**

No. 93–C–254.

United States District Court, E.D. Wisconsin.

Feb. 16, 1994.

Reinhart, Boerner, Van Deuren, Norris & Rieselbach, by Scott W. Hansen and Katherine McConahay, Milwaukee, WI, for plaintiff.

Winthrop & Weinstine, by Eric J. Nystrom, St. Paul, MN, for defendant.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

Akrosil Division of International Paper Company ["Akrosil"] commenced this action in Winnebago County circuit court on February 4, 1993. On March 12, 1993, Ritrama Duramark, Inc. ["Ritrama"] removed this action to federal court pursuant to 28 U.S.C. § 1441(a).

In its amended complaint, Akrosil alleges that Ritrama violated a series of contracts with it when Ritrama failed to pay the full amount due for siliconized paper liners manufactured by Akrosil specifically for Ritrama. Akrosil seeks damages of $110,580.94 plus interest from Ritrama.

Ritrama has filed four counterclaims. Only Ritrama's first counterclaim alleging breach of contract is relevant to this decision and order. In that counterclaim, Ritrama makes the following allegations:

1. On or about June 25, 1992, Ritrama and Akrosil entered into an agreement (the "Agreement") pursuant to which a claim by Ritrama in the amount of $108,741.42 against Akrosil was settled.

2. The terms and conditions of the Agreement are memorialized in correspondence dated June 26, 1992 from Michael J. Stoll of Ritrama to William Bergen of Akrosil. . . .

3. During the negotiations leading up to the Agreement, William J. Bergen of Akrosil specifically represented that he had authority to enter the Agreement on behalf of Akrosil.

4. Akrosil has breached the Agreement with Ritrama.

5. As a result of Akrosil's breach of the Agreement with Ritrama, Ritrama has been damaged in an amount of at least $108,741.42.

Presently before the court is Akrosil's motion for summary judgment on Ritrama's first counterclaim. Akrosil's motion will be denied.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment is appropriate where the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. Pursuant to Rule 56(c), only a "genuine issue" of "material fact" will defeat an otherwise proper motion for summary judgment. Material facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. *Id.* In determining whether the movant has satisfied his burden of persuasion on a summary judgment motion, the evidence is evaluated in the light most favorable to the nonmovant such that all justifiable or reasonable inferences are drawn in the nonmovant's favor. *Id.* at 255, 106 S.Ct. at 2513.

## II. BACKGROUND

Ritrama manufactures transfer adhesive products ["TAPs"] and membrane switch materials ["MSMs"]. Siliconized paper liners are used in the manufacture of TAPs and MSMs. *Annis deposition ["depo."] at 26–28.* TAPs and MSMs allow end users to apply adhesive to printed parts such as automobile speedometer facing plates or microwave oven keypads so that the printed parts can be applied to the larger product being manufactured (i.e. the automobile or the microwave oven). At time of use, the paper liners are peeled away to expose the adhesive material of the TAP or MSM. The paper liners are then discarded. *Id.* at 24–26.

In 1991 and 1992, Akrosil supplied siliconized paper liners to Ritrama for use in Ritrama's manufacture of TAPs and MSMs. *See Annis depo.* exhibit # 9. However, early in 1992 Ritrama began receiving customer reports of failures of their TAPs that utilized Akrosil liners. *Annis depo.* at 79. Consequently, Ritrama refused to pay past due invoices totalling $85,014.12 for four shipments of Akrosil G5J/G1H liners delivered to Ritrama in late 1991 and early 1992. *See Annis depo.* exhibit # 9. Ritrama contends that two of those four shipments of Akrosil liner were nonconforming resulting in $108,741.42 in damages to Ritrama. *See Annis depo.* exhibit # 5; *Bergen affidavit ["aff."]* at ¶ 2.

During May and June of 1992, Akrosil and Ritrama began negotiating to resolve their dispute concerning the two allegedly defective shipments of Akrosil G5J/G1H paper liners and Ritrama's four past due invoices. *Bergen aff.* at ¶ 2; *Annis depo.* at 103, 110, 115, and 116. On June 25, 1992, a meeting was held in Minneapolis ["the Minneapolis meeting"] between Michael Annis, Daryl Hanzal, and Michael Stoll of Ritrama and William Bergen of Akrosil. *Bergen aff.* at ¶ 3. Akrosil and Ritrama dispute the purpose and the substance of the Minneapolis meeting.

Ritrama contends that it requested the Minneapolis meeting specifically for the purpose of resolving Ritrama's $108,741.42 product failure claim against Akrosil. *Stoll depo.* at 43; *Annis depo.* exhibit # 11. Ritrama also claims that Akrosil's representative at that meeting, Mr. Bergen, asserted that he had authority to settle Ritrama's claim against Akrosil. *Hanzal depo.* at 75 and 77.

Akrosil asserts, on the other hand, that the purpose of the Minneapolis meeting was primarily to negotiate future sales of Akrosil liners to Ritrama and secondarily to resolve the dispute over Ritrama's refusal to pay its

overdue account balance with Akrosil. *Bergen aff.* at ¶ 3; *Brown aff.* at ¶ 2. Akrosil also states that Mr. Bergen had no authority to enter into any agreements with Ritrama at the Minneapolis meeting. *Bergen aff.* at ¶ 4.

Following the Minneapolis meeting, Mr. Stoll sent a letter dated June 26, 1992, to Mr. Bergen ["the Stoll letter"] memorializing the substance of a settlement agreement allegedly entered into between representatives of Akrosil and Ritrama at the Minneapolis meeting. *Bergen aff.* at ¶ 6; *Bergen aff.* exhibit B. *See also* appendix A (copy of the Stoll letter). The Stoll letter was postmarked July 10, 1992. *Bergen aff.* exhibit D. Mr. Bergen received the Stoll letter on July 13, 1992. *Bergen aff.* at ¶ 6.

Prior to receipt of the Stoll letter, Akrosil advised Ritrama on three different occasions (by facsimile, phone, and letter) of its position on the issues discussed during the Minneapolis meeting. *Bergen aff.* at ¶ 5 and *Bergen aff.* exhibit A (copy of June 30, 1992, facsimile from Mr. Bergen to Mr. Hanzal); *Brown depo.* at 88–91 (describing phone conversation between Mr. Brown of Akrosil and Mr. Stoll); *Nealon aff.* exhibit E (copy of July 9, 1992, letter from Akrosil's counsel Andrew Branham to Mr. Hanzal). Akrosil's view of the discussions that took place at the Minneapolis meeting contrasts sharply with Ritrama's understanding of what occurred at that meeting as summarized in the Stoll letter.

After receipt of the Stoll letter on July 13, 1992, Mr. Brown sent a letter dated July 20, 1992, to David Bohn, president of Ritrama, confirming an earlier phone conversation with him in which Mr. Brown stated that Akrosil would not accept the terms outlined in the Stoll letter. *Brown aff.* at ¶ 5; *Brown aff.* exhibit A.

### III. ANALYSIS

■ In Ritrama's first counterclaim, Ritrama seeks to enforce the oral settlement agreement allegedly reached between representatives of Akrosil and Ritrama at the Minneapolis meeting and subsequently memorialized in the Stoll letter ["the Minneapolis agreement"]. Akrosil argues, however, that Ritrama's first counterclaim must be dismissed because the Minneapolis agreement fails to comply with the statute of frauds for transactions in goods of $500 or more and is therefore unenforceable. *See* Uniform Commercial Code ["U.C.C."] § 2–201(1) and (2); Wis.Stat. § 402.201(1) and (2).

Specifically, Akrosil contends that there is no "writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought [i.e. Akrosil] or by the party's authorized agent or broker." *See* Wis.Stat. § 402.201(1). Furthermore, upon receipt of the Stoll letter, Akrosil gave timely "written notice of objection" to it, thus preserving its statute of frauds defense. *See* Wis.Stat. § 402.201(2).

Ritrama counters that Akrosil's statute of frauds defense to Ritrama's first counterclaim has no merit because the statute of frauds (i.e. Wis.Stat. § 402.201) relied on by Akrosil only applies to transactions in goods and not settlement agreements. *See* U.C.C. § 2–102 and Wis.Stat. § 402.102 (limiting the applicability of provisions of the U.C.C., such as U.C.C. § 2–201(1), Wis.Stat. § 402.201(1) to "transactions in goods."); *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1266–67 (1st Cir. 1991) (holding that a settlement agreement is not a transaction in goods governed by the U.C.C.); *New England Power Co. v. Riley Stoker Corp.*, 20 Mass.App.Ct. 25, 477 N.E.2d 1054, 1060–61 (1985) (refusing to treat an agreement settling a dispute over the sale of defective boilers as one for the sale of goods). Consequently, Ritrama contends that a Wis. Stat. § 402.201 statute of frauds argument, as a grounds for summary judgment on Ritrama's first counterclaim, which is based on the Minneapolis agreement, is not applicable.

Ritrama also argues that Wisconsin's general statute of frauds, Wis.Stat. § 241.02(1), does not apply because the Minneapolis agreement could, by its terms, have been performed within one year thus negating the need for a writing. *See Nelsen v. Farmers Mutual Auto Ins. Co.*, 4 Wis.2d 36, 52, 90 N.W.2d 123 (1958).

In response to Ritrama's contention that the U.C.C.'s statute of frauds does not bar the enforceability of the Minneapolis agree-

ment, Akrosil argues, in the alternative, that the Minneapolis agreement must be construed as a modification of the late 1991 and early 1992 contracts between Akrosil and Ritrama as opposed to a new contract between Akrosil and Ritrama for the future sale of Akrosil liners. Consequently, Akrosil contends that the Minneapolis agreement, construed as a modification of the prior Akrosil/Ritrama contracts, must also comply with the U.C.C.'s statute of frauds. *See* U.C.C. § 2–209(3); Wis.Stat. § 402.209(3); *Ruble Forest Products, Inc. v. Lancer Mobile Homes, Inc.*, 269 Or. 315, 524 P.2d 1204, 1206 (1974). Accordingly, since Akrosil maintains that the Minneapolis agreement did not comply with the U.C.C.'s statute of frauds, Akrosil argues that the Minneapolis agreement, whether construed as a modification of prior Akrosil/Ritrama contracts or as a contract for the future sale of goods, is unenforceable requiring summary judgment in favor of Akrosil on Ritrama's first counterclaim.

■ Based on the above arguments advanced by Akrosil and Ritrama, a necessary threshold issue to deciding Akrosil's partial summary judgment motion is whether the Minneapolis agreement constitutes a settlement agreement or a contract for the sale of goods. Under Wisconsin law, to determine whether the U.C.C. applies to an agreement involving the sale of both goods and services, the predominant factor test is used. Thus:

> The test for inclusion or exclusion [within the U.C.C.] is not whether [contracts] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g. contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g. installation of a water heater in a bathroom).

*Micro-Managers, Inc. v. Gregory*, 147 Wis.2d 500, 507, 434 N.W.2d 97 (Wis.Ct.App.1988) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974)). For the U.C.C. to apply to the Minneapolis agreement, the predominant purpose of that agreement would have to be the sale of goods rather than some other purpose such as the provision of services or the settlement of a dispute.

■ In a mixed goods and services agreement, the question of whether goods or services predominate an agreement is a question of fact. *Conopco, Inc. v. McCreadie*, 826 F.Supp. 855, 868 (D.N.J.1993). *See also Downriver Internists v. Harris Corp.*, 929 F.2d 1147, 1151 (6th Cir.1991) (holding goods versus services question properly submitted to the jury). However, where the agreement is unambiguous, and there are no facts in dispute, it is not error for the court to rule, as a matter of law, whether a contract is for goods or services. *See United States v. City of Twin Falls*, 806 F.2d 862, 870 (9th Cir.1986), *cert. denied sub nom. City of Twin Falls v. Envirotech Corp.*, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987).

Akrosil and Ritrama contest what occurred at the Minneapolis meeting and the substance of what was agreed there. Akrosil contends that the Minneapolis meeting was held primarily to discuss future sales of Akrosil paper liners to Ritrama (i.e. a sale of goods) and only secondarily to resolve Ritrama's refusal to pay its overdue account balance with Akrosil for earlier product delivered by Akrosil to Ritrama. *See Bergen aff.* at ¶ 3; *Brown aff.* at ¶ 2. On the other hand, Ritrama states that the Minneapolis meeting was solely for the purpose of settling the ongoing dispute between Akrosil and Ritrama over Akrosil's allegedly defective paper liners supplied to Ritrama by Akrosil. *Stoll depo.* at 43. Akrosil denies that it ever acquiesced to the terms of the Minneapolis agreement. *Bergen aff.* at ¶ 5; *Brown aff.* at ¶ 5. Based on the present record, there is ambiguity as to whether the Minneapolis agreement is a settlement agreement or a contract for the sale of goods.

Consequently, I conclude that a genuine issue of material fact exists as to whether the predominate purpose of the Minneapolis agreement is the sale of goods or the settlement of a dispute. Thus, I am precluded from finding, as a matter of law, that the U.C.C. applies to the Minneapolis agreement. It follows that Akrosil is not entitled to summary judgment on Ritrama's first counterclaim based on the theory that the statute of frauds of the U.C.C. (i.e. U.C.C. § 2–201(1),

Wis.Stats. § 402.201(1)) bars enforceability of the Minneapolis agreement.

■ Akrosil's alternative argument, that the statute of frauds applies (and hence bars the enforceability of the Minneapolis agreement) because that oral agreement must be deemed a modification of its late 1991 and early 1992 contracts with Ritrama (rather than a new contract for future sales of Akrosil liners), does not save its motion for partial summary judgment. This is because whether a contract has been modified is a question of fact. *See, e.g., Dime Box Petroleum Corp. v. Louisiana Land and Exploration Co.,* 717 F.Supp. 717, 720 (D.Colo.1989), *aff'd,* 938 F.2d 1144 (10th Cir.1991); *Hilkert v. Zimmer,* 90 Wis.2d 340, 342–343, 280 N.W.2d 116 (1979). I believe that there is a genuine issue of material fact as to whether the Minneapolis agreement is a modification of the late 1991 and early 1992 Akrosil/Ritrama contracts or is merely a settlement agreement not subject to the U.C.C.'s statute of frauds.

## ORDER

Therefore, IT IS ORDERED that Akrosil's motion for partial summary judgment be and hereby is denied, with costs.

# RITRAMA DURAMARK

APPENDIX A

June 26, 1992

CC: Daryl Hanzal
Michael Annis

Mr. William J. Bergen
Market Manager
Akrosil
206 Garfield Avenue
P.O. Box 8001
Menasha, WI
54952-8001

EXHIBIT

B

Dear Bill:

As we agreed during our meeting of yesterday the 25th at 4:30 p.m. and in the presence of yourself, Daryl Hanzal, Michael Annis and Mike Stoll, Ritrama Duramark agrees to debit Akrosil in the amount of $75,000 against our current outstanding balance totaling $85,014.12. As we discussed, this debit will cover losses sustained by Ritrama Duramark in the amount of $65,000 for credits we've issued to our customers. This resulted from our use of defective product provided to us by Akrosil during late 1991 respective to 40MG/12/12 G5J/G1H release coated liner (lot #'s 92310 and 92764).

This debit is further inclusive of losses sustained by Ritrama Duramark in the amount of $10,000 to cover our costs to properly dispose of 166 rolls of unuseable product in both 27" and 54" widths. You indicated that you thought it best we dispose of the product here and we were assessed these costs by our hazardous waste removal service.

As we further agreed during our meeting, we enclose a check in the amount of $10,014.12, an amount which should satisfy our current outstanding debt as stated in your letter dated June 11, 1992.

Since Ritrama Duramark's total losses sustained amounted to claims totaling $108,741.42 for defective product, as well as loss of profit during Q192, Akrosil has agreed to allow Ritrama Duramark to purchase G5J/G1H liner at a reduced rate (as yet to be determined) for the 18 month period beginning July 1, 1992 and ending December 31, 1993. As agreed, this arrangement is, contingent upon Ritrama's forecast of future purchases and based upon business lost and hopefully regained during the 18 month period ending on the above date. Ritrama Duramark agrees that Akrosil will not be liable for the existing balance of $33,741.22 if Ritrama is unable to meet its commitment to future purchases throughout 1993.